UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRIAXX PRIME CDO 2006-1, LTD., TRIAXX PRIME CDO 2006-2, LTD., and TRIAXX PRIME CDO 2007-1, LTD., | 16 Civ. _____  (     ) |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| J.P. MORGAN CHASE & CO., U.S. BANK, NATIONAL ASSOCIATION, and THE BANK OF NEW YORK MELLON, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd. and Triaxx Prime CDO 2007-1, Ltd. (collectively, "Triaxx," unless the context otherwise requires), by their attorneys, Miller & Wrubel P.C., allege against defendants J.P. Morgan Chase & Co. ("JPMC"), U.S. Bank, National Association ("U.S. Bank"), and The Bank of New York Mellon ("BNY Mellon"), as follows:

### ALLEGATIONS COMMON TO
### ALL CAUSES OF ACTION

#### Summary of the Action

1.      This action concerns residential mortgage-backed securities ("RMBS") trusts affiliated with JPMC.[1]  The public record establishes that JPMC's unlawful conduct with respect to RMBS is of staggering magnitude.  JPMC paid the

---

[1] This Complaint makes no claims based in any way whatsoever on the mortgage loans that were originated, acquired, sold or serviced by Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Securities Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc. (on its behalf or as successor by merger to Banc of America Securities LLC) (each, a "BofA Party") or any entity which directly or indirectly controls or controlled, is or was controlled by or is or was under common control by a BofA Party.

largest fine ever—$13 billion—for fraudulently selling RMBS to public investors.[2]  In 2012, JPMC paid approximately $5 billion in the National Mortgage Settlement (as defined below) for, *inter alia*, unlawful servicing practices against borrowers.[3]  JPMC's proposed settlement to resolve claims by private RMBS investors surrounding representations and warranties ("R&Ws"), as well as servicing, violations in the amount of $4.5 billion is *sub judice* at present.[4]

2.     Triaxx estimates its lifetime losses in trusts that were either sponsored or serviced by JPMC or one of its affiliates ("JPMC Trusts") will reach approximately $85 million.  Triaxx brings this action to recover losses on claims not released by the settlements set forth above, caused by the unlawful conduct of JPMC and/or the breaches of contractual and fiduciary duties of U.S. Bank and BNY Mellon as trustees of the JPMC Trusts.

3.     Triaxx asserts three sets of claims:  (i) against JPMC, for breaches of its contractual duties as servicer with respect to the WMALT Trusts (as defined below) (First Cause of Action); (ii) against U.S. Bank, the Trustee for the WMALT Trusts and other JPMC Trusts in which Triaxx holds certificates, for breaches of its contractual and fiduciary duties as Trustee (Second and Fourth Causes of Action); and (iii) against BNY Mellon, the Trustee for other JPMC Trusts in which Triaxx holds certificates, for

---

[2] *See, e.g.*, Settlement Agreement, People v. J.P. Morgan Securities LLC, No. 451556/2012 (N.Y. Sup. Ct. Nov. 19, 2013).

[3] *See* United States of America v. Bank of America, et al., No. 1:12-cv-00361-RMC (D.D.C., JP Morgan Chase Consent Judgment filed April 4, 2012;  United States of America v. Bank of America, et al., No. 1:12-cv-00361-RMC (D.D.C., Consent Judgment filed April 5, 2012)(the "National Mortgage Settlement").

[4] *See* In the Matter of the Application of the U.S. National Bank Association, No. 652382/2014 (Supreme Court, New York County, Petition filed Aug. 3, 2014)(the "JPMC Article 77 Settlement").

breaches of its contractual and fiduciary duties as Trustee (Third and Fifth Causes of Action).

4.     Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2007-1 Trust ("WMALT 2007-1"); and Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2007-3 Trust ("WMALT 2007-3;" together with WMALT 2007-1, the "WMALT Trusts") are not covered by the JPMC Article 77 Settlement that is now pending.

5.     JPMC had (and has) a serious conflict of interest as servicer for the WMALT Trusts and has abused its role as servicer for those trusts to damage the WMALT Trusts and benefit itself instead.

6.     As servicer for the WMALT Trusts, JPMC modified first lien mortgage loans beneficially owned by the WMALT Trusts on residential properties securing those loans, by reducing the principal amount of those first lien loans – immediately and irrevocably causing losses to the WMALT Trusts.  At the same time, however, JPMC (not the WMALT Trusts) was the *mortgagee* on *second* lien mortgage loans on those same residential properties.

7.     The facts that led to modification of the first lien loans should have, under industry standard servicing principles and the "prudent servicer" standard set forth in the PSAs as discussed below, caused the second lien loans to be written off before there was a write-off of any first lien loan.  Upon information and belief, JPMC agreed to reduce the principal amount of the first lien loans *while leaving intact the second lien loans on which it was mortgagee*.  This conduct arising from JPMC's blatant conflict of interest amounted to outright theft from the WMALT Trusts, to the severe

economic detriment of the certificateholders in those trusts ("Certificateholders") such as Triaxx.

8.      WaMu Asset Acceptance Corp. and Washington Mutual Bank (collectively, "WaMu"), the sponsor of the WMALT Trusts that was purchased by JPMC, systemically disregarded the loan underwriting standards that should have applied to the loans beneficially owned by the WMALT Trusts, and the resulting breaches of R&Ws by WaMu.

9.      However, U.S. Bank, as Trustee of the WMALT Trusts, in breach of its contractual and fiduciary duties to act on behalf of those trusts and their Certificateholders, completely failed to discharge its duties and obligations.  As a result, the statutes of limitations for the WMALT Trusts to pursue JPMC on the R&W claims have expired, and U.S. Bank has not pursued JPMC's servicing failures.  This leaves U.S. Bank liable for its failure to pursue those or any other claims.

10.     The pending JPMC Article 77 Settlement does not release any claims against trustees for JPMC Trusts, ***except*** with respect to the trustees' act of entering into the settlement.  Triaxx owns 13 JPMC Trusts that were covered by the JPMC Article 77 Settlement (but only as to the trustees' act of entering into the settlement), having expected lifetime losses of approximately $85 million.  As set forth more fully below, breaches of contractual and fiduciary duties by the trustees of those Trusts – U.S. Bank and BNY Mellon – were a proximate cause of those losses.

11.     Because the JPMC Article 77 Settlement did not cover or settle claims against trustees of JPMC Trusts for breaches of their duties as trustees in dealing with the trust collateral itself, Triaxx asserts those claims here.

## The Parties, Jurisdiction and Venue

12.     Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd. and Triaxx Prime CDO 2007-1, Ltd. (collectively, "Triaxx") are all corporations, referred to as exempt companies, incorporated under the laws of the Cayman Islands, with their principal place of business located at Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002.  Triaxx is a citizen of the Cayman Islands for purposes of 28 U.S.C. § 1332(a).

13.     JPMC is a corporation organized under the laws of the State of Delaware with its principal place of business at 270 Park Avenue, New York NY 10017. JPMC is a citizen of the States of Delaware and New York for purposes of 28 U.S.C. § 1332(a).  JPMC acquired WaMu from FDIC receivership in or about September 2008. The question of whether JPMC is liable for WaMu's R&W breaches is presently on appeal.[5]

14.     U.S. Bank is a national banking association with its registered main office located in Cincinnati, Ohio.  U.S. Bank is a citizen of Ohio for purposes of 28 U.S.C. § 1332(a).  U.S. Bank is the trustee for the WMALT Trusts.  U.S. Bank is also the trustee for the following JPMC Trusts in which Triaxx invested: BSABS 2005-AC3, BSABS 2005-AC5, JPMMT 2006-S3, JPMMT 2006-S4, JPMMT 2007-S1, and JPMMT 2006-S2.  JPMC or an affiliate was a sponsor of these trusts.

15.     BNY Mellon is a bank organized under the laws of the State of New York with its principal place of business in New York and is a citizen of New York for purposes of 28 U.S.C. § 1332(a).  BNY Mellon is also the trustee for the following

---

[5] *See* Deutsche Bank National Trust v. FDIC, No. 15-05326 (D.C. Cir.).

JPMC Trusts in which Triaxx invested: CHASE 2006-S3, CHASE 2006-S4, CHASE 2007-S1, CHASE 2007-S2, CHASE 2007-S3, CHASE 2007-S4, and CHASE 2006-S5. JPMC was the sponsor and servicer of these trusts.

16.    The trusts described in paragraphs 12 and 13, in addition to the WMALT Trusts, are collectively "Subject Trusts."

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(2) because it is an action between citizens of a State and a citizen of a foreign state (Cayman Islands).

18.    This Court has personal jurisdiction over JPMC, BNY Mellon, and U.S. Bank because all systematically do business in the State of New York.

19.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because JPMC, BNY Mellon and U.S. Bank have a substantial presence in this District, a substantial part of the events or omissions giving rise to the claims in this action occurred in this District; and JPMC, BNY Mellon and U.S. Bank are subject to personal jurisdiction in this District.

**Background – RMBS Trusts**

20.    RMBS trusts are created to facilitate the securitization and sale of residential mortgage loans to investors.  A RMBS trust's assets consist entirely of the underlying loans, and the principal and interest payments ("P&I") on the loans are "passed through" to the certificateholders.  Between 2004 and 2008, a handful of large financial institutions — including JPMC — dominated the RMBS market and controlled the process from beginning to end.  These banks acted as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors

or beholden to them through warehouse lending or other financial arrangements.  Once RMBS loans are originated, acquired and selected for securitization, the sponsor creates a trust where the loans are deposited for the benefit of the certificateholders.  The sponsor also hand-picks the servicer, often an affiliate of the sponsor or originator, to collect payments on the loans.

21.     To ensure the quality of the RMBS and the underlying loans, the trust documents generally include R&Ws from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those R&Ws.  Because the risk of non-payment or default on the loans is "passed through" to investors, other than these R&Ws, the large investment banks and other players in the mortgage securitization industry have no "skin" in the game once the RMBS are sold to certificateholders.  Instead, their profits are principally derived from the spread between the cost to originate or purchase loans and how much they can sell them to investors once packaged as securities, as well as various servicing-related income.  Accordingly, volume has become the focus, and the quality of the loans has been disregarded.

22.     The Subject Trusts were typical RMBS trusts, created in 2005, 2006 and 2007, meeting the description above.

**Role of the Trustee**

23.     The fundamental role of a trustee in a RMBS securitization is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus.  Certificateholders have no access to the underlying loan files and other documents necessary to confirm compliance with the representations and

warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests. U.S. Bank and BNY Mellon, as Trustees, were each the sole contractual party in the subject Trusts' securitization process intended to be independent of the bank that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with sponsors, lenders, or both. Certificateholders must rely on the Trustee to protect the rights and interests of RMBS Trusts.

24.     U.S. Bank and BNY Mellon knew that the pools of loans backing the Subject Trusts were filled with defective mortgage loans. The abysmal performance of the trusts' collateral — including spiraling defaults, delinquencies and foreclosures — is outlined in monthly remittance reports U.S. Bank and BNY Mellon published as Trustees. Therefore, U.S. Bank and BNY Mellon were on *de facto* notice of an Event of Default since at least 2010.

25.     Under the governing Pooling and Servicing Agreements (the "PSAs"), U.S. Bank and BNY Mellon have operated under "Events of Default" since at least December 15, 2011, when, on information and belief, they received written notice that large numbers of ineligible loans were deposited in the Subject Trusts, and hundreds of other trusts, and that JPMC had failed to meet its obligations as Servicer. To this date, the Events of Default with respect to the Subject Trusts remain uncured.

26.     Further, under the PSAs, within ninety days after the occurrence of an Event of Default, U.S. Bank and BNY Mellon were obligated to transmit by mail to all Certificateholders notice of each Event of Default known to U.S. Bank and BNY Mellon, unless the Event of Default has been cured or waived. Although Events of Default

occurred and were not — and have not been — cured or waived, U.S. Bank and BNY Mellon have failed to provide written notice to the Certificateholders of the Events of Default. U.S. Bank and BNY Mellon have covered up the Events of Default for several self-interested reasons. Among other things, as discussed in greater detail below, if U.S. Bank and BNY Mellon had provided notice of an Event of Default, that would have greatly increased their liabilities and duties while their compensation under the PSAs would have remained the same.

27.    Finally, after the Events of Default, U.S. Bank and BNY Mellon failed to exercise their rights as trustees under the PSAs for the Subject Trusts as prudent persons would, under those circumstances, in the conduct of their own affairs. U.S. Bank and BNY Mellon did nothing to protect the Subject Trusts and their Certificateholders, choosing instead to ignore the egregious Events of Default for their own benefit and to the detriment of Certificateholders such as Triaxx.

**Triaxx Standing – Demand Unnecessary**

28.    Certificateholders of the Subject Trusts have standing. For example, Certificate Holders of WMALT Trusts are specifically identified in § 10.10 of the PSAs for the WMALT Trusts as parties that receive the "benefit" and the entitlement to assert "any legal or equitable right, remedy or claim under this Agreement." As such, Certificateholders such as Triaxx are entitled to assert claims for breaches of the PSAs such as those asserted in this Complaint. Triaxx's claims are direct, not derivative. *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, Nos. 14-cv-8175 (SAS), 14-cv-9366 (SAS), 14-cv-10101 (SAS), 2015 U.S. Dist. LEXIS 70675 at 47-50 (S.D.N.Y. June 1,

2015).  Compliance with the pre-suit requirements of the PSAs' "no action" clause is therefore not required.

29.     Even if compliance with pre-suit requirements of the PSA's "no action" clause were otherwise required, it is excused.  If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Triaxx to demand that BNY Mellon and U.S. Bank initiate proceedings against themselves, an "absurd" requirement that the parties did not intend.  *Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).  Compliance is also not required, and is excused, with respect to Triaxx's claims against JPMC.  As set forth in detail in this Complaint, BNY Mellon and U.S. Bank have long refused in the face of overwhelming evidence, including a demand made on or about December 15, 2011, to take action of any kind against JPMC. Demanding that BNY Mellon and U.S. Bank sue JPMC would demonstrably be futile, excusing demand were it required (which it is not).

**JPMC's Abuse of Its Role as Servicer for the WMALT and Other Trusts**

30.     Under the PSAs, JPMC was required to service the mortgage loans beneficially owned by the WMALT Trusts "consistent with prudent mortgage loan servicing practices and (unless inconsistent with prudent mortgage loan servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar mortgage loans for other portfolios…."  JPMC not only breached that contractual obligation but used its role as servicer as a license to steal from the WMALT Trusts.

31.     As servicer for the WMALT Trusts, JPMC was in a position to, and did, agree to modify first lien mortgage loans beneficially owned by the WMALT

Trusts on residential properties securing those loans, by reducing the principal amount of those first lien loans – immediately and irrevocably causing losses to the WMALT Trusts.  At the same time, however, JPMC (not the WMALT Trusts) was the *mortgagee* on *second* lien mortgage loans on those same residential properties.

32.     While the facts that led to modification of the first lien loans would have, under industry standard servicing principles and the "prudent servicer" standard set forth in the PSAs, caused the second lien loans to be written off before there was any write-off of a first lien loan, JPMC agreed to reduce the principal amount of the first lien loans *while leaving intact the second lien loans on which it was mortgagee*.  This conduct arising from JPMC's blatant conflict of interest amounted to outright theft from the WMALT Trusts, to the severe economic detriment of the Certificateholders in those trusts such as Triaxx.

33.     On information and belief, there have been dozens of such improper first lien modifications in the WMALT Trusts.

34.     Attached hereto as Exhibit 1 is a demonstrative exhibit providing specific examples as to twelve (12) residential properties on which in 2011 through 2015, JPMC has, upon information and belief, made improper first lien loan modifications for the benefit of JPMC and to the detriment of the WMALT Trusts.

35.     A first example of JPMC's improper first lien loan modifications is a property in Pasadena, California.  This property had a first lien loan of $714,000 at origination.  The mortgage loan schedule did not disclose a second lien loan of $102,000 on which, on information and belief, JPMC was the mortgagee.  In September 2011, the first lien loan was modified by reducing the principal amount, resulting in a loss of

$64,300 to the WMALT Trusts.  On information and belief, the second lien loan continued in force in its original amount.  This was a blatant conflict of interest on JPMC's part.  Prudent loan servicing would have called for the second lien loan to be written down before the first lien loan was affected in any way.

36.     A second example of JPMC's improper first lien loan modifications is a property in Chula Vista, California.  This property had a first lien loan of $1 million and a second lien loan of $25,000, as a result of of a refinancing in February 2007.  In October 2012, the first lien loan was modified by reducing the principal amount, resulting in a loss of $427,451 to the WMALT Trust.  On information and belief, the second lien loan continued in force in its original amount.  Once again, this was a blatant conflict of interest on JPMC's part.  Prudent loan servicing would have called for the second lien loan to be written down before the first lien loan was affected at all.

37.     JPMC engaged in other misdeeds as servicer.  For example, JPMC serviced the mortgage for a residence in Miami, Florida, which served as collateral for the trust CHASE 2007-53.  The residence was purchased in March 2007 for $875,000 and financed by first and second lien mortgages.  Although borrower's first delinquency was in February 2009, the loan was not sold out of CHASE 2007-S3 until March 2012 for $380,000 and booking a loss to the trust of $560,000.  The property was sold again one year later, in March 2013, for $670,000.  Part of the losses were $116,000 that JPMC charged to the loan without explanation.

**Dereliction of Duties as Trustee**

38.     U.S. Bank has done nothing about JPMC's improper first lien loan modifications, standing by idly while the fox looted the henhouse.  Unfortunately, this is

simply a continuation of U.S. Bank's inaction during the entire time that U.S. Bank has been the Trustee for the WMALT Trusts.

39.     U.S. Bank's dereliction of duty to stop JPMC's looting of first lien mortgages is emblematic of the breaches of both U.S. Bank and BNY Mellon for failing to protect Certificateholders of the Subject Trusts in their entirety.  Each of the Subject Trusts' loan pools contained a high percentage of loans that materially breached the sellers' R&Ws, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' rights in those mortgage loans.  Specifically, the R&Ws regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV ratios and combined loan-to-value ("CLTV") ratios were systemically and pervasively false.

40.     The extremely high default rates of the mortgage loans within the Subject Trusts and the decline in their credit ratings to below investment grade are strong evidence of the originators' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Subject Trusts.

41.     The Subject Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually had the characteristics originators represented and warranted.

42.     The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools ultimately backing the certificates.  Loan pools that were properly underwritten and that contained loans with the represented characteristics would have experienced substantially

fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.  The significant rating downgrades experienced by the Subject Trusts are also strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics the sellers represented and warranted.

43.     U.S. Bank was more than on notice of the problems with WaMu-created RMBS.  Government reports and investigations and newspaper reports have uncovered the extent of the pervasive abandonment of underwriting standards.  The Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis.  *Using WaMu as a case study*, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets.  *The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans*.[6]

44.     Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Subject Trusts.  For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan — the largest settlement with a single entity in American history — to resolve federal and state civil claims arising out of the packaging,

---

[6] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011) (emphasis added).

marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and WaMu.  As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with the originator's underwriting guidelines" and breached the originator's representations and warranties.

## FIRST CAUSE OF ACTION
### (Breach of Contract - JPMC)

45.     Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

46.     The PSAs are valid contracts that memorialize the issuance of certificates of beneficial interests in the Subject Trusts, and establish JPMC's contractual duties and obligations, in its capacity as Servicer to the Trusts and all their respective Certificateholders.

47.     As current holders of Certificates issued by each of the Trusts, which Triaxx has held substantially the entire time since those Certificates were issued, the Triaxx plaintiffs are express, intended beneficiaries under the PSAs entitled to enforce the obligations of JPMC as Servicer.

48.     As Servicer, under the PSAs, JPMC was required to service the mortgage loans beneficially owned by the WMALT Trusts "consistent with prudent mortgage loan servicing practices and (unless inconsistent with prudent mortgage loan servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar mortgage loans for other portfolios…."

49.     JPMC breached that contractual obligation by, among other things, agreeing to modify first lien loans owned by the WMALT Trusts so as to reduce the

principal balance thereof, causing immediate and irrevocable losses to the WMALT

Trusts' Certificateholders, without first modifying or writing off junior second lien loans

as to which JPMC was in a conflicted position as mortgagee.

     50.     Triaxx as a Certificateholder of the WMALT Trusts was damaged

by JPMC's breach of contract.

     51.     Triaxx has been damaged by JPMC's breach of contract in an

amount to be determined at trial but not less than $7 million.

### SECOND CAUSE OF ACTION
**(Breach of Contract – U.S. Bank)**

     52.     Triaxx repeats and realleges each and every allegation set forth in

the preceding paragraphs as if fully set forth herein.

     53.     Under the PSAs, U.S. Bank owed a duty to all Certificateholders

(i) to give prompt written notice to all parties to the PSA of a breach of a representation

or warranty made by the seller in respect of the mortgage loans that materially and

adversely affect the value of any mortgage loan or the interests of the Certificateholders

in any mortgage loan, upon their discovery of the breach; and (ii) to take such action with

respect to the breach as may be necessary or appropriate to enforce the rights of the

Trusts with respect to the breach.

     54.     As set forth above, U.S. Bank materially breached each PSA by (i)

failing to provide prompt written notice to all parties to the PSA and related responsible

parties of breaches of the sellers' mortgage loan representations and warranties, upon

their discovery of the breaches; and (ii) failing to enforce JPMC's obligation to

repurchase, substitute, or cure the defective mortgage loans.

55.     In addition, the PSAs required U.S. Bank, upon an "Event of Default," to (i) provide written notice to all Certificateholders of the Event of Default within ninety days of its occurrence, unless the Event of Default was cured or waived; and (ii) exercise the rights and powers vested in them by the PSAs using the same degree of care and skill as a prudent person would exercise under the circumstances in the conduct of such person's own affairs.

56.     The PSAs define an "Event of Default" to include the failure by the servicer, JPMC, to observe or perform in any material respect the covenants or agreements by the servicer set forth in the PSA, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the trustee requiring the failure to be remedied.  Since at least October 2011, JPMC has been on final notice of its servicing failures

57.     As set forth above, Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of JPMC's failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.

58.     JPMC has failed to do the following, each of which has materially impaired the rights of the Subject Trusts and their Certificateholders:

(a)     <u>Breaches of Representations and Warranties</u>.  As with the Trustee, the PSAs required JPMC to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the

Certificateholders in any mortgage loan, upon the servicer's discovery of the breach.  JPMC has failed to give notice to the other parties of the following information, which has exacerbated losses experienced by the Subject Trusts:

> (i)      Although JPMC has modified mortgage loans, and in the process of doing so has discovered that specific loans breached applicable representations and warranties, JPMC has not notified the other parties of these breaches, and is a position of conflict of interest with respect thereto; and

> (ii)     although aware of specific mortgage loans that breach applicable representations and warranties, JPMC has failed to enforce the sellers' obligation to repurchase, substitute, or cure the defective loans as required under the PSAs.

(b)      Violation of Prudent Servicing Obligations.  The PSAs require JPMC to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs, (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third-parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicer's right to receive compensation or other fees for its services under the PSAs, the

servicer's obligation to make servicing advances under the PSAs, and the servicer's ownership, servicing, or management for others of any other mortgage loans.  In violation of their prudent-servicing obligations under the PSAs, on information and belief JPMC has:

(i)     As set forth above, improperly modified and written down first lien loans while leaving intact second lien loans as to which JPMC was the mortgagee;

(ii)    failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage-servicing standards;

(iii)   failed to timely and accurately apply payments made by borrowers and maintain accurate account statements;

(iv)    failed to demand that the sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered;

(v)     imposed force-placed insurance when the servicers knew or should have known that borrowers already had adequate coverage;

(vi)    incurred completely avoidable and unnecessary servicing fees and servicing advances to maintain the mortgaged properties; and

(vii)    prejudiced the interests of the Trusts and the

Certificateholders in the mortgages by fostering uncertainty as to

the timely recovery of collateral.

(c)    Violation of Foreclosure Obligations.   The PSAs require

JPMC to use reasonable efforts, consistent with accepted servicing

practices, to foreclose upon or otherwise comparably convert the

ownership of properties securing mortgage loans that come into and

continue in default and as to which no satisfactory arrangements can be

made for collection of delinquent payments.   Moreover, each of the PSAs

contemplates that foreclosures and liquidations of defaulted mortgages

will proceed forthwith and in accordance with applicable law, provided

the documentation is in order, as a matter of fairness to all parties.

Despite these covenants, JPMC has:

(i)    continued to keep defaulted mortgage loans on their

books, rather than foreclose or liquidate the loans, in order to

wrongfully maximize their servicing fees, at the expense of the

Trusts' and Certificateholders' best interests, including the right to

recover from pool or financial guaranty insurance policies;

(ii)    failed to maintain records in an accurate,

appropriate, and adequate manner, which has impeded the process

of foreclosure and liquidation of defaulted mortgages and caused

wholly avoidable delays that have injured the Trusts and

Certificateholders;

20

      (iii)    continued to charge unearned and unwarranted servicing fees on mortgages that would have been liquidated but for the servicers' breach of their duties, as well as unauthorized fees for default-related services; and

      (iv)    failed to place the interests of the Trusts and Certificateholders before their own interests.

      (d)    <u>Violation of Modification Obligations</u>.  The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances.  When modifications are required to remedy predatory lending violations, the PSAs require the seller — not the Trusts or the Certificateholders — to bear the costs to cure the violations.  The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcing the sellers' obligation to cure predatory mortgages.  The servicers have also unjustly enriched their parent companies by using Trust collateral to settle claims that were not, and could never be, made against the Trusts, in a manner that has materially and adversely affected the interests of the Certificateholders.  The servicers have therefore failed:

(i)      to demand that the originators and sponsors comply with their obligation to cure or repurchase predatory and ineligible loans that the servicers agreed to modify in the attorneys general settlements; and

(ii)      to deliver to the trustees a certification of a servicing officer that all requirements have been satisfied with respect to the modified mortgage loan.

(e)      <u>Improper Servicing Advances</u>.  The PSAs provide that the servicers may recover servicing advances that are customary, reasonable, and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations, including, but not limited to, the cost of the preservation, restoration, and protection of a mortgaged property.  Despite the requirement that servicing advances be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors — which marked up their services to a level 100% or more above the market price — to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement the servicers' servicing income.

59.      U.S. Bank and their responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Nevertheless, U.S. Bank failed to deliver written notices to the servicers of

the defaults or terminate the servicers.  Similarly, U.S. Bank and BNY Mellon failed to provide Certificateholders with notice of these Events of Default.  By failing to take these actions, U.S. Bank materially breached the PSAs.

60.     As set forth herein, Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the issuers' defaults in their performance of their obligations under the Indentures.  U.S. Bank and their responsible officers had knowledge of these and other defaults by the issuers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Consequently, U.S. Bank had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in its exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the indenture trustee's rights to recover for these Events of Default, and would have done so promptly.  Similarly, U.S. Bank failed to provide Noteholders with notice of these Events of Default.  By failing to take these actions, U.S. Bank materially breached the Governing Agreements.

61.     These Events of Default occurred, remained uncured for the requisite period of time, and are continuing.  Consequently, under the PSAs, U.S. Bank had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the trustee's rights to recover for these Events

of Default, and would have done so promptly.  By failing to take this action, U.S. Bank materially breached the PSAs.

62.     The material breaches of the PSAs by U.S. Bank has directly and proximately caused damages to the Triaxx as Certificateholder in the Subject Trusts in that they have deprived the Subject Trusts of valuable remedies and allowed millions of dollars in Trust assets to waste away.  For example, had U.S. Bank protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of R&Ws, the Trusts would have received either cured or substituted mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  The inaction of U.S. Bank and BNY Mellon with respect to the sellers has allowed the Subject Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had U.S. Bank and BNY Mellon enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.

63.     The material breaches of the PSAs by U.S. Bank have injured Triaxx, in that they caused Triaxx losses, have diminished the value of the certificates in the Subject Trusts and have prevented the Subject Trust Certificateholders from protecting the rights of the Trusts.

64.     As a result of their breaches of contract, judgment should be entered in favor of Triaxx and against U.S. Bank in an amount to be proven at trial but not less than $85 million.

## THIRD CAUSE OF ACTION
### (Breach of Contract – BNY Mellon)

65.     Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

66.     Under the PSAs, BNY Mellon owed a duty to all Certificateholders (i) to give prompt written notice to all parties to the PSA of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affect the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon their discovery of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

67.     As set forth above, BNY Mellon materially breached each PSA by (i) failing to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon their discovery of the breaches; and (ii) failing to enforce JPMC's obligation to repurchase, substitute, or cure the defective mortgage loans.

68.     In addition, the PSAs required BNY Mellon, upon an "Event of Default," to (i) provide written notice to all Certificateholders of the Event of Default within ninety days of its occurrence, unless the Event of Default was cured or waived; and (ii) exercise the rights and powers vested in them by the PSAs using the same degree of care and skill as a prudent person would exercise under the circumstances in the conduct of such person's own affairs.

69.     The PSAs define an "Event of Default" to include the failure by the servicer, JPMC, to observe or perform in any material respect the covenants or

agreements by the servicer set forth in the PSA, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the trustee requiring the failure to be remedied.  Since at least October 2011, JPMC has been on formal notice of its servicing failures.

70.     As set forth above, Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the JPMC's failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.

71.     JPMC has failed to do the following, each of which has materially impaired the rights of the Subject Trusts and their Certificateholders:

(a)     Breaches of Representations and Warranties.  As with the Trustee, the PSAs required JPMC to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon the servicer's discovery of the breach.  JPMC has failed to give notice to the other parties of the following information, which has exacerbated losses experienced by the Subject Trusts:

(i)     Although JPMC has modified mortgage loans, and in the process of doing so has discovered that specific loans breached applicable representations and warranties, JPMC has not

notified the other parties of these breaches, and is a position of conflict of interest with respect thereto; and

(ii)     although aware of specific mortgage loans that breach applicable representations and warranties, JPMC has failed to enforce the sellers' obligation to repurchase, substitute, or cure the defective loans as required under the PSAs.

(b)     <u>Violation of Prudent Servicing Obligations</u>.  The PSAs require JPMC to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs, (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third-parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicer's right to receive compensation or other fees for its services under the PSAs, the servicer's obligation to make servicing advances under the PSAs, and the servicer's ownership, servicing, or management for others of any other mortgage loans.  In violation of their prudent-servicing obligations under the PSAs, on information and belief JPMC has:

(iii)     As set forth above, improperly modified and written down first lien loans while leaving intact second lien loans as to which JPMC was the mortgagee;

(iv)    failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage-servicing standards;

(v)    failed to timely and accurately apply payments made by borrowers and maintain accurate account statements;

(vi)    failed to demand that the sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered;

(vii)    imposed force-placed insurance when the servicers knew or should have known that borrowers already had adequate coverage;

(viii)    incurred completely avoidable and unnecessary servicing fees and servicing advances to maintain the mortgaged properties; and

(ix)    prejudiced the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral.

(c)    <u>Violation of Foreclosure Obligations</u>.  The PSAs require JPMC to use reasonable efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, each of the PSAs

28

contemplates that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.  Despite these covenants, JPMC has:

> (x)     continued to keep defaulted mortgage loans on their books, rather than foreclose or liquidate the loans, in order to wrongfully maximize their servicing fees, at the expense of the Trusts' and Certificateholders' best interests, including the right to recover from pool or financial guaranty insurance policies;

> (xi)     failed to maintain records in an accurate, appropriate, and adequate manner, which has impeded the process of foreclosure and liquidation of defaulted mortgages and caused wholly avoidable delays that have injured the Trusts and Certificateholders;

> (xii)     continued to charge unearned and unwarranted servicing fees on mortgages that would have been liquidated but for the servicers' breach of their duties, as well as unauthorized fees for default-related services; and

> (xiii)   failed to place the interests of the Trusts and Certificateholders before their own interests.

(d)     <u>Violation of Modification Obligations</u>.  The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances.  When modifications are required to remedy

predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations.  The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcing the sellers' obligation to cure predatory mortgages. The servicers have also unjustly enriched their parent companies by using Trust collateral to settle claims that were not, and could never be, made against the Trusts, in a manner that has materially and adversely affected the interests of the Certificateholders.  The servicers have therefore failed:

> (i)      to demand that the originators and sponsors comply with their obligation to cure or repurchase predatory and ineligible loans that the servicers agreed to modify in the attorneys general settlements; and

> (ii)      to deliver to the trustees a certification of a servicing officer that all requirements have been satisfied with respect to the modified mortgage loan.

(e)      <u>Improper Servicing Advances</u>.  The PSAs provide that the servicers may recover servicing advances that are customary, reasonable, and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations, including, but not

limited to, the cost of the preservation, restoration, and protection of a mortgaged property.  Despite the requirement that servicing advances be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors - which marked up their services to a level 100% or more above the market price - to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement the servicers' servicing income.

72.     BNY Mellon and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Nevertheless, BNY Mellon failed to deliver written notices to the servicers of the defaults or terminate the servicers.  Similarly, BNY Mellon failed to provide Certificateholders with notice of these Events of Default.  By failing to take these actions, BNY Mellon materially breached the PSAs.

73.     As set forth herein, Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the issuers' defaults in performing their obligations under the Indentures.  BNY Mellon and its responsible officers had knowledge of these and other defaults by the issuers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Consequently, BNY Mellon had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in its exercise as a prudent person

would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the indenture trustee's rights to recover for these Events of Default, and would have done so promptly.  Similarly, BNY Mellon failed to provide Noteholders with notice of these Events of Default.  By failing to take these actions, U.S. Bank materially breached the Governing Agreements.

74.     These Events of Default occurred, remained uncured for the requisite period of time, and are continuing.  Consequently, under the PSAs, BNY Mellon had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the trustee's rights to recover for these Events of Default, and would have done so promptly.  By failing to take this action, BNY Mellon materially breached the PSAs.

75.     The material breaches of the PSAs by BNY Mellon have directly and proximately caused damages to the Triaxx as Certificateholder in the Subject Trusts in that they have deprived the Subject Trusts of valuable remedies and allowed millions of dollars in Trust assets to waste away.  For example, had BNY Mellon protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of R&Ws, the Trusts would have received either cured or substituted mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  The inaction of BNY Mellon with respect to the sellers has allowed the Subject Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the

Trusts' losses.  Similarly, had U.S. Bank and BNY Mellon enforced the servicers'

prudent servicing obligations, the Trusts would have been able to avoid incurring

unnecessary losses and expenses.

76.     The material breaches of the PSAs by BNY Mellon have injured

Triaxx, in that they caused Triaxx losses, have diminished the value of the certificates in

the Subject Trusts and have prevented the Subject Trust Certificateholders from

protecting the rights of the Trusts.

77.     As a result of their breaches of contract, judgment should be

entered in favor of Triaxx and against BNY Mellon in an amount to be proven at trial but

not less than $44 million.

**FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty – U.S. Bank)**

78.     Triaxx repeats and realleges each and every allegation set forth in

the preceding paragraphs as if fully set forth herein.

79.      After the occurrence of an Event of Default, U.S. Bank's duties

expanded to include a fiduciary duty owed to the Subject Trusts and all

Certificateholders.  This fiduciary duty included the obligation to exercise its

contractually conferred rights and powers in good faith and to bring all available claims

for the benefit of the Subject Trusts and the Certificateholders following an Event of

Default.  Following the Events of Default described above, U.S. Bank breached its

fiduciary duties to the Subject Trusts and all Certificateholders in several respects.

80.     First, U.S. Bank, in its capacity as Trustee, had standing to bring

claims against the sellers of loans to the Subject Trusts for breach of their representations

and warranties under the Governing Agreements.  At the time of the Events of Default,

meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements.  U.S. Bank, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators.  Moreover, U.S. Bank failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

81.     The failure by U.S. Bank to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, as well as its failure to provide notice to the Certificateholders of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted breaches of U.S. Bank's fiduciary duty to the Subject Trusts and to all Certificateholders.

82.     Second, U.S. Bank, in its capacity as Trustee, had standing to bring meritorious claims against the servicers to enforce the the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  U.S. Bank, however,

has refused to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations.  Moreover, U.S. Bank failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs.  U.S. Bank's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as their failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of their fiduciary duty to the Subject Trusts and to all Certificateholders.

83.     U.S. Bank's breaches of its fiduciary duty have directly and proximately caused damages to the Subject Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against JPMC but for U.S. Bank's breaches of its fiduciary duty.

84.     U.S. Bank's breaches of its fiduciary duty have injured Triaxx, in that they have caused Triaxx losses, have diminished the value of the certificates held by Triaxx, and have prevented the Subject Trusts' Certificateholders from protecting the rights of the trusts.

85.     As a result of U.S. Bank's breaches of fiduciary duty, judgment should be entered in favor of Triaxx and against U.S. Bank in an amount to be proven at trial but not less than $31 million.

**FIFTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty – BNY Mellon)**

86.     Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

87.     After the occurrence of an Event of Default, BNY Mellon's duties expanded to include a fiduciary duty owed to the Subject Trusts and all Certificateholders.  This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Subject Trusts and the Certificateholders following an Event of Default.  Following the Events of Default described above, BNY Mellon breached its fiduciary duties to the Subject Trusts and all Certificateholders in several respects.

88.     First, BNY Mellon, in their capacity as Trustee, had standing to bring claims against the sellers of loans to the Subject Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements.  BNY Mellon, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators.  Moreover, BNY Mellon failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

89.     The failure by BNY Mellon to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, as well as its failure to provide notice to the Certificateholders of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted breaches of BNY Mellon's fiduciary duty to the Subject Trusts and to all Certificateholders.

90.     Second, BNY Mellon, in its capacity as Trustee, had standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  BNY Mellon, however, has refused to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations.  Moreover, BNY Mellon failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs.  BNY Mellon's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as their failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the

servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of their fiduciary duty to the Subject Trusts and to all Certificateholders.

91.     BNY Mellon's breaches of its fiduciary duty have directly and proximately caused damages to the Subject Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against JPMC but for BNY Mellon's breaches of its fiduciary duty.

92.     BNY Mellon's breaches of its fiduciary duty have injured Triaxx, in that they have caused Triaxx losses, have diminished the value of the certificates held by Triaxx, and have prevented the Subject Trusts' Certificateholders from protecting the rights of the trusts.

93.     As a result of BNY Mellon's breaches of fiduciary duty, judgment should be entered in favor of Triaxx and against U.S. Bank in an amount to be proven at trial but not less than $44 million.

WHEREFORE, Triaxx demands judgment in its favor and against JPMC and U.S. Bank as follows:

(i)     On its First Cause of Action, awarding Triaxx a money judgment against JPMC in an amount not less than $7 million, plus interest at the New York statutory rate of  9% per year from the applicable dates of breach to date of judgment;

(ii)    On its Second Cause of Action, awarding Triaxx a money judgment against U.S. Bank in an amount not less than $31 million, plus interest at the New York statutory rate of  9% per

year from the applicable dates of breach to date of judgment to date of judgment in such amount as the Court finds is just and equitable;

(iii)    On its Third Cause of Action, awarding Triaxx a money judgment against BNY Mellon in an amount not less than $44 million, plus interest at the New York statutory rate of 9% per year from the applicable dates of breach to date of judgment to date of judgment in such amount as the Court finds is just and equitable;

(iv)    On its Fourth Cause of Action, awarding Triaxx a money judgment against U.S. Bank in an amount not less than $31 million, plus interest to date of judgment in such amount as the Court finds is just and equitable;

(v)    On its Fifth Cause of Action, awarding Triaxx a money judgment against BNY Mellon in an amount not less than $44 million, plus interest to date of judgment in such amount as the Court finds is just and equitable; and

(vi)    Granting such other or further relief as the Court may deem just and proper in the circumstances.

Dated:  March 2, 2016

                                        MILLER & WRUBEL P.C.

                                    By: _____
                                        John G. Moon
                                        Charles R. Jacob III
                                        570 Lexington Avenue
                                        New York, New York 10022
                                        212-336-3500

                                        *Attorneys for Plaintiffs*

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  March 2, 2016

MILLER & WRUBEL P.C.

By:  _____

John G. Moon
Charles R. Jacob III
570 Lexington Avenue
New York, New York 10022
212-336-3500

*Attorneys for Plaintiffs*