UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRIAXX PRIME CDO 2006-1, LTD.,<br>TRIAXX PRIME CDO 2006-2, LTD., and<br>TRIAXX PRIME CDO 2007-1, LTD.,<br><br>Plaintiffs,<br><br>-against-<br><br>THE BANK OF NEW YORK MELLON, and<br>U.S. BANK, NATIONAL ASSOCIATION,<br><br>Defendants. | 16 Civ. 01597  (NRB)<br><br>**THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2,

Ltd. and Triaxx Prime CDO 2007-1, Ltd. (collectively, "Triaxx" or the "Triaxx CDOs,"

unless the context otherwise requires), by their attorneys, Miller & Wrubel P.C., allege

against defendants U.S. Bank, National Association ("U.S. Bank") and The Bank of New

York Mellon ("BNY Mellon") (collectively, "Defendants"), as follows:

### ALLEGATIONS COMMON TO
### ALL CAUSES OF ACTION

#### Introduction

1.    This action concerns residential mortgage-backed securities

("RMBS") having U.S. Bank or BNY Mellon as Trustee.[1]  In 2006 and 2007, Triaxx

---

[1] This Complaint makes no claims based in any way whatsoever on the mortgage loans that were originated, acquired, sold or serviced by Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Securities Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc. (on its behalf or as successor by merger to Banc of America Securities LLC) (each, a "BofA Party") or any entity which directly or indirectly controls or controlled, is or was controlled by or is or was under common control by a BofA Party.

purchased forty-five (45)[2] such securities at or about the time of their issuance having a notional value of approximately $4.26 billion (the "Subject Trusts").  A list of the Subject Trusts is annexed hereto as Exhibit A.

      2.    The public record establishes that many of the loans collateralizing the Subject Trusts were not as represented and were not properly serviced; however, Defendants failed to honor their duties as Trustees of the Subject Trusts.  For example, Defendants breached their contractual obligations to give notice of the burgeoning mortgage loan failures, which eventually became a national financial disaster.  In addition, the statutes of limitations for the Subject Trusts to pursue representation and warranty claims for the faulty loans have expired, and Defendants have not pursued servicing and master servicer failures.  Defendants are liable for their failures to pursue those and other claims.  Triaxx has been damaged by those failures in an amount of approximately $280 million.

      3.    Triaxx asserts claims: (i) against U.S. Bank, the Trustee for thirty-three (33) Subject Trusts in which Triaxx holds Certificates, for breaches of U.S. Bank's contractual duties as Trustee, negligence and fiduciary duty; and (ii) against BNY Mellon, the Trustee for another twelve (12) Subject Trusts in which Triaxx holds certificates, for breaches of BNY Mellon's contractual duties as Trustee, negligence and fiduciary duty.

---

[2] The securities at issue in this Action have been revised from Triaxx's prior pleading primarily due to changes in the composition of Triaxx's holdings since the time that pleading was filed.

**The Parties, Jurisdiction and Venue**

4.     The Triaxx CDOs are all corporations, referred to as exempt companies, incorporated under the laws of the Cayman Islands, with their principal place of business located at Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002.  Triaxx is a citizen of the Cayman Islands for purposes of 28 U.S.C. § 1332(a).

5.     U.S. Bank is a national banking association with its registered main office located in Cincinnati, Ohio.  U.S. Bank is a citizen of Ohio for purposes of 28 U.S.C. § 1332(a).  U.S. Bank is the Trustee for 32 of the Subject Trusts as shown on Exhibit A.

6.     BNY Mellon is a bank organized under the laws of the State of New York with its principal place of business in New York.  BNY Mellon is a citizen of New York for purposes of 28 U.S.C. § 1332(a).  BNY Mellon is the Trustee for 13 of the Subject Trusts as shown on Exhibit A.

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(2) because it is an action between citizens of a State and citizens of a foreign state (Cayman Islands).

8.     This Court also has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 632 because a corporation organized under the laws of the United States is a party to this action, and this action arises out of transactions involving international and foreign financial operations.

9.     This Court has personal jurisdiction over U.S. Bank and BNY Mellon because they systematically do business in the State of New York.

3

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because U.S. Bank and BNY Mellon have a substantial presence in this District, a substantial part of the events or omissions giving rise to the claims in this action occurred in this District; and U.S. Bank and BNY Mellon are subject to personal jurisdiction in this District.

**I.**

**SUMMARY OF THE CASE**

**A.     RMBS Trusts**

11.     RMBS trusts are created to facilitate the securitization and sale of residential mortgage loans to investors.  An RMBS trust's assets consist entirely of the underlying loans, and the principal and interest payments ("P&I") on the loans are "passed through" to the certificateholders.  Between 2004 and 2008, a handful of large financial institutions dominated the RMBS market and controlled the process from beginning to end.  These banks acted as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors or beholden to them through warehouse lending or other financial arrangements.  Once RMBS loans are originated, acquired and selected for securitization, the sponsor creates a trust where the loans are deposited for the benefit of the certificateholders.  The sponsor also hand-picks the servicer (and/or master servicer), often an affiliate of the sponsor or originator, to collect payments on the loans.

12.     To ensure the quality of the RMBS and the underlying loans, the trust documents generally include representations and warranties ("R&Ws") from the loan sellers ("Warrantors") attesting to the quality and characteristics of the mortgages, as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those R&Ws.  Because the risk of non-payment or default on the loans is "passed

4

through" to investors, other than these R&Ws, the large investment banks and other players in the mortgage securitization industry have no "skin in the game" once the RMBS are sold to certificateholders.  Instead, their profits are principally derived from the spread between the cost to originate or purchase loans and how much they can sell them to investors once packaged as securities, as well as various servicing-related income.  Accordingly, volume became the focus, and the quality of the loans was disregarded.

13.     The Subject Trusts were typical RMBS trusts, created in 2005, 2006 and 2007, meeting the description above.

**B.**     **Role of the Trustee**

14.     The fundamental role of a trustee in a RMBS securitization is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust *corpus*.  Certificateholders have no access to the underlying loan files and other documents necessary to confirm compliance with the R&W's, cannot monitor the servicers' (and master servicers') conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests.  U.S. Bank and BNY Mellon, as Trustees, were each the sole party in the Subject Trusts' securitization process intended to be independent of the investment bank that sponsored the securitization, the lenders that originated the loans, and the servicers and master servicers that were often affiliated with sponsors, lenders, or both. Certificateholders must rely on the trustee to protect the rights and interests of RMBS trusts.

15.     The rights and responsibilities of parties involved in an RMBS trust are governed by a number of agreements ("Governing Agreements").  Under the

terms of one such Governing Agreement, the Pooling and Servicing Agreements (the

"PSAs"), U.S. Bank and BNY Mellon were required to give notice of breaches of R&Ws

and seek that such breaches be cured.  They were also required to take action against the

failure of servicers and master servicers.  U.S. Bank and BNY Mellon failed to perform

these contractual obligations.

16.     Indenture trustees, like U.S. Bank and BNY Mellon are also

subject to extra-contractual duties.

17.     One of these extra-contractual duties, which Defendants were

subject to at all times, is the duty to avoid conflicts of interest.  *See Millenium Partners,*

*L.P. v. United States Bank Nat'l Ass'n*, 2013 U.S. Dist. LEXIS 55729, at *10, (S.D.N.Y.

Apr. 17, 2013), *aff'd*, 2016 U.S. App. LEXIS 12595 (2d Cir. July 6, 2016).

18.     U.S. Bank and BNY Mellon derived significant business revenues

from its relationships with other RMBS participants and did not want to disrupt those

relationships by enforcing R&W claims or declaring events of default against servicers

and master servicers, as such actions would endanger future prospects for financial gain.

The Defendants turned a blind eye to those breaches in hopes that the RMBS participants

would return a favor.  Indeed, U.S. Bank and BNY Mellon were richly rewarded, having

the second and third largest market share for trusteeship of a $3 trillion private label

RMBS market.  In addition to this *quid pro quo*, U.S. Bank put its interests ahead of

Certificateholders, because it was also a loan originator and servicer, and it did not want

to draw attention to its own unlawful activities by enforcing the Governing Agreements.

19.     Another one of these extra-contractual duties, which Defendants

were subject to upon an Event of Default (defined below), was the "prudent person" duty

of care.  When an Event of Default occurred, Defendants were required to exercise the

same degree of care and skill that a prudent person would exercise or use under the

circumstances in the conduct of such person's own affairs.  As described in further detail

below, by failing to take various actions to protect the Subject Trusts and

Certificateholders, Defendants breached this extra-contractual duty.

## II.

## STANDING; DEMAND EXCUSED

      20.    The Triaxx CDOs bring this action under the direction of their

Collateral Manager pursuant to:  (i) the Collateral Management Agreement dated as of

September 8, 2006 between Triaxx Prime CDO 2006-1, Ltd., as issuer, and the Collateral

Manager; (ii) the Collateral Management Agreement dated as of December 14, 2006

between Triaxx Prime CDO 2006-2, Ltd., as issuer, and the Collateral Manager; and (iii)

the Collateral Management Agreement dated as of March 29, 2007 between Triaxx Prime

CDO 2007-1, as issuer, and the Collateral Manager.  These three Collateral Management

Agreements are identical in all respects relevant here, and are hereinafter referred to

collectively as the "Collateral Management Agreements" or "CMAs."

      21.    The power to act with respect to the Triaxx CDOs' collateral,

which is comprised of certificates in RMBS including those at issue in this action, is

expressly conveyed to the Collateral Manager pursuant to the Collateral Management

Agreements.  The Collateral Manager:

> shall … *take on behalf of the Issuer or direct the Trustee to take* [various enumerated] actions with respect to a Collateral Debt Security, an Equity Security or an Eligible Investment:  … [including] *exercis[ing] any other rights or remedies* with respect to such Collateral Debt Security, Equity Security or Eligible Investment as provided in the related Underlying Instruments or *tak[ing] any other action*

> *consistent with the terms of the Indenture which the*
> *Collateral Manager reasonably believes to be in the best*
> *interests of the Noteholders.* CMAs, § 2(d) (emphasis
> added.)

In furtherance of the foregoing, the Triaxx CDOs appointed the Collateral Manager:

> the Issuer's true and lawful agent and attorney-in-fact, with
> full power of substitution and full authority in the Issuer's
> name, place and stead and without any necessary further
> approval of the Issuer, in connection with the performance
> of the Collateral Manager's duties provided for in this
> Agreement, including the … powers … [to] take any other
> action specified in Section 2(d).  CMAs, § 2(p) (emphasis
> added).

22.     The language of §§ 2(d) and (p) of the CMAs, above, provides

authority to the Collateral Manager to cause the Triaxx CDOs to pursue litigation "in the

Issuer's name," that is, in the names of the Triaxx CDOs.  Further, § 10(b) of the

Collateral Management Agreements provides for the Collateral Manager to be

indemnified "for all reasonable fees and expenses … incurred in investigating, preparing

[or] *pursuing any claim, action [or] proceeding*" relating to the Triaxx CDOs (emphasis

added).  Thus, the Collateral Management Agreements specifically contemplate the

Collateral Manager "pursuing" litigation in the name of the Triaxx CDOs.

23.     The Trustee of the Triaxx CDOs, defendant U.S. Bank, has

confirmed in practice this understanding of the Collateral Management Agreements'

operation.  Over the last several years, U.S. Bank has been fully aware of, and as Trustee

has participated in, proceedings where the Triaxx CDOs litigated in their own names

under the direction of the Collateral Manager.  *See*: *In re application of U.S. Bank*

*National Association, et al.*, New York County Index No. 652382/2014; and *In re*

*Residential Capital, LLC*, Chapter 11 Case No. 12-12020 (Bankr. S.D.N.Y. 2012).

24.     U.S. Bank also performed Trustee services for the Triaxx CDOs in connection with the settlement of *In re the Application of The Bank of New York Mellon, et al.*, New York County Index No. 651786/2011, in which the Triaxx CDOs, as here, litigated in their own names under the direction of the Collateral Manager.

25.     At no time over the years in these matters did U.S. Bank as Trustee ever suggest in any manner whatsoever that the Triaxx CDOs lacked standing to litigate in their own names under the direction of the Collateral Manager.

26.     In addition, by letter dated August 11, 2016, the Collateral Manager, as the Triaxx CDOs' attorney-in-fact, directed U.S. Bank, as Trustee, pursuant to § 2(d) of the Collateral Management Agreements, to take the following steps:

A. Assign and grant back to the Triaxx CDOs all right and standing to assert the claims asserted in the this action.  This is necessary because U.S. Bank as trustee cannot reasonably be expected to sue itself.

B. Identify the Depository Trust Company ("DTC") participant in whose name the securities of the eight Subject Trusts beneficially owned by the Triaxx CDOs are registered with DTC; and (b) direct that DTC participant to instruct DTC/Cede & Co. (or give the instruction if U.S. Bank is the participant) to allow or cause DTC/Cede & Co. to be added as a nominal plaintiff in the this Action (a procedure DTC/Cede & Co. are quite familiar with).  Alternatively, U.S. Bank may obtain a written consent from DTC/Cede & Co. for the Triaxx CDOs to proceed in DTC/Cede & Co.'s place rather than adding DTC/Cede & Co. as a nominal plaintiff; and

C. As to ten RMBS for which U.S. Bank raises an "additional demand party" argument, waive the alleged requirement of such additional demand, a step that the Collateral Manager reasonably believes to be in the best interests of the Noteholders and, accordingly, has the power to direct the Trustee to take.

Exhibit B.

27.     In its March 21, 2017 Memorandum and Order in this action (the "3/21/17 Order"), the Court ruled that the matters set forth in paragraphs 21-26, above, were insufficient to give the Triaxx CDOs standing to pursue this action.  Triaxx realleges them here to preserve its position on appeal and as background for the following.

28.     Section 7.5 of the Indentures requires the "Issuer (or the Trustee on behalf of the Issuer) … to take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to … (iv) enforce any of the Pledged Securities [which include the RMBS at issue in this action] or other instruments or property included in the Collateral."  The claims asserted in this action are rights and remedies of the Triaxx CDOs with respect to the Pledged Securities and assets of the Triaxx CDOs constituting part of the Collateral, as defined in the Indentures.  The Triaxx CDOs, as Issuers, have attempted to pursue those claims in accordance with Section 7.5 and have been unable to do so in this Action without the cooperation of U.S. Bank as the CDO Trustee.  Accordingly, it is incumbent on U.S. Bank as the CDO Trustee to pursue or facilitate the pursuit of such claims.

29.     Absent an assignment of the right to pursue such claims to the Triaxx CDO, or to the Collateral Manager, U.S. Bank is operating under an irreconcilable conflict of interest, which it has a legal obligation to avoid.  U.S. Bank, in its capacity as the CDO Trustee, is forfeiting, in its own self-interest, valuable property rights in the RMBS collateral belonging to the Triaxx CDOs and their Noteholders.

30.     By letter dated April 18, 2017, a copy of which is annexed hereto as Exhibit C, the Collateral Manager, as the Triaxx CDOs' attorney-in-fact, pursuant to §

2(d) of the Collateral Management Agreements, directed U.S. Bank, as trustee, to assign its authority to the Triaxx CDOs or to the Collateral Manager, and appoint the Collateral Manager as its designee, to pursue the Triaxx Action on its behalf.  In light of U.S. Bank's conflict of interest, the Collateral Manager, is acting on behalf of the Triaxx CDOs and the holders of the Triaxx CDO Notes.  To the extent U.S. Bank as the CDO Trustee fails to do so, such failure is a breach of the CDO Trustee's duty to avoid conflicts as well as its duties under the Indentures, and in particular Section 7.5 thereof.

31.    Any otherwise applicable requirement of demand to bring this action is excused under the doctrine of *Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("*Cruden*").

32.    Even if compliance with pre-suit requirements of the Subject Trusts' PSAs' "no action" clauses were otherwise required, it is excused under the circumstances here.  If the no action clause's pre-suit requirements for the Subject Trusts were to apply, they would require Triaxx to demand that BNY Mellon and U.S. Bank initiate proceedings against themselves, an "absurd" requirement that the parties did not intend.  *Id.*; *Blackrock Core Bond Portfolio v. U.S. Bank N.A.*, 2016 U.S. Dist. LEXIS 23572, at *35 (S.D.N.Y. Feb. 26, 2016).

33.    Any demand requirements in the Indentures for the Triaxx CDOs are likewise excused.  Demand on U.S. Bank is excused as set forth above, and there is just one other entity – Wells Fargo Bank N.A. ("Wells Fargo") – that might otherwise be in a position to make demand.  Wells Fargo, however, is the trustee defendant in at least four RMBS trustee actions pending in this Court raising allegations and issues virtually

identical to those in this action.[3]  *Cruden* excuses demand on Wells Fargo because Wells Fargo would be conflicted as it would need to take positions exposing it to liability for hundreds of millions of dollars – tantamount to suing itself.

34.     In its March 21, 2017 memorandum and order, the Court stated that "if [Triaxx] wish[es] to assert contract claims in the amended complaint, [Triaxx] must also explain how [it] has cured the standing issues identified [there]in."  In compliance with that directive, Triaxx submits that its April 18, 2017 letter to U.S. Bank, coupled with the relief requested in the Seventh Claim For Relief, cures the standing issue identified by the Court.

### III.

### DEFENDANTS' DUTIES UNDER THE GOVERNING AGREEMENTS

35.     The Governing Agreements, and in particular the PSAs, set forth Defendants' contractual duties to the Certificateholders.  The Governing Agreements require that U.S. Bank and BNY Mellon hold the Trust assets for the use and benefit of all present and future Certificateholders.  For example, when the Subject Trusts were formed, depositors transferred the loans to U.S. Bank "for the benefit of all present and future Holders of the Certificates," and U.S. Bank "acknowledge[d]" the trusts and "agree[d] to perform the duties set forth in th[e Governing] Agreement in accordance with its terms."  BSABS 2005-AC3, PSA § 2.06(a).

---

[3] *See* the following RMBS trustee actions:  *Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*, 14-CV-09371 (KPF) (S.D.N.Y.); *National Credit Union Administration Board v. Wells Fargo Bank, N.A.*, 14-CV-10067 (KPF) (S.D.N.Y.); *Phoenix Light SF Limited v. Wells Fargo Bank, N.A.*, 14-CV-10102 (KPF) (S.D.N.Y.); and *Commerzbank AG v. Wells Fargo Bank N.A.*, 15-CV-10033 (KPF) (S.D.N.Y.).  The allegations and issues in those cases are virtually identical to those presented in this RMBS trustee action.

A.   **Duties to Provide Notice of Breaches and Effectuate**
     **the Repurchase Obligations**

36.   The Governing Agreements impose on U.S. Bank and BNY

Mellon various obligations in respect of the repurchase remedies set forth in the PSAs.

37.   The Governing Agreements generally require Defendants to give

prompt written notice to all parties upon discovery of a breach of an R&W made by a

Warrantor to the trust that materially and adversely affects the value of any mortgage

loan or the interests of the Certificateholders in any loan.  In addition, the Governing

Agreements generally require Defendants to take such action as may be necessary or

appropriate to enforce the rights of the Trusts with respect to the breach.  The contractual

provisions that Defendants violated are set forth in Exhibit D and are incorporated herein.

38.   For example, Section 2.03(d) of the BSABS 2005-AC3 PSA, for

which U.S. Bank is the trustee, provides that:

> Upon discovery by any of the parties hereto of a breach of a
> representation or warranty set forth in Section 7 of the
> Mortgage Loan Purchase Agreement that materially and
> adversely affects the interests of the Certificateholders in any
> Mortgage Loan, the party discovering such breach shall give
> prompt written notice thereof to the other parties.  The Seller
> hereby covenants with respect to the representations and
> warranties set forth in Section 7 of the Mortgage Loan
> Purchase Agreement, that within 90 days of the discovery of
> a breach of any representation or warranty set forth therein
> that materially and adversely affects the interests of the
> Certificateholders in any Mortgage Loan, it shall cure such
> breach in all material respects and, if such breach is not so
> cured, (i) if such 90-day period expires prior to the second
> anniversary of the Closing Date, remove such Mortgage
> Loan (a "Deleted Mortgage Loan") from the Trust Fund and
> substitute in its place a Replacement Mortgage Loan, in the
> manner and subject to the conditions set forth in this Section.

39.   Similarly, Section 2.3(b) of the FHAMS 2005-FA7 PSA, for which

BNY Mellon is the trustee, provides that:

> Upon discovery by any of the parties hereto of a breach of a
> representation or warranty made pursuant to Schedule B to
> the MLPA that materially and adversely affects the interests
> of the Certificateholders in any Mortgage Loan, the party
> discovering such breach shall give prompt notice thereof to
> the other parties.

40.     Furthermore, Section 2.1(a) of the FHAMS 2005-FA7 PSA

provides that BNY Mellon has

> all the right, title and interest of the Depositor in and to
> the Trust Fund together with (i) the Depositor's right to
> (A) require the Seller to cure any breach of a representation
> or warranty made by the Seller pursuant to the MLPA, or
> (B) repurchase or substitute for any affected Mortgage
> Loan in accordance herewith, and (ii) all right, title and
> interest of the Depositor in, to and under the Servicing
> Agreement, which right has been assigned to the Depositor
> pursuant to the MLPA.

**B.     Duties Regarding the Servicers and Master Servicers**

41.     Under the Governing Agreements, Defendants have certain duties

with respect to enforcing the obligations of the servicers and master servicers.  In

particular, when U.S. Bank or BNY Mellon learn of a servicer's or, in some cases, a

master servicer's, failure to observe or perform in any material respect any other

covenants or agreements under the PSAs, they must promptly provide written notice to

the servicer.  The contractual provisions that Defendants violated are set forth in Exhibits

E and F, and are incorporated herein.

42.     The PSAs also set forth the obligations of U.S. Bank and BNY

Mellon upon occurrence of a servicer/master servicer "Event of Default," which is

defined as a specified failure of the servicer to perform its servicing duties and cure this

failure within a specified time period.  The PSAs identify several types of failures by

servicers and master servicers that may give rise to a servicer/master servicer Event of

Default.  Such failures include the servicer's or master servicer's failure to observe or perform in any material respect any covenants or agreements in the PSA, including, among other things, the failure to service loans in accordance with prudent servicing standards or the failure to supervise and oversee the servicing of the mortgage loans, which continues unremedied for sixty days after written notice of such failure shall have been given to the servicer by the Indenture Trustee.

43.     Under the "prevention doctrine," the failure of U.S. Bank and BNY Mellon to give notice to the servicers of an Event of Default does not prevent the triggering of an Event of Default should their failure result from their own negligence or willful misconduct.  *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2016 U.S. Dist. LEXIS 12982, at *16-17 (S.D.N.Y. Feb. 3, 2016) (under the "prevention doctrine," a "party may not insist upon performance of a condition precedent when its non-performance has been caused by the party itself." (quotations omitted)).[4]

44.     For example, Section 9.01(ii) of the WMALT 2007-1 PSA, for which U.S. Bank is the Trustee, provides that "Events of Default by the Servicer" include the:

> Failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or in this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25%.

---

[4] As set forth in Exhibit G, the Trustees remained liable for their own negligence and willful misconduct.

45.     Similarly, Section 9.01(b) of the CHASE 2006-S3 PSA, for which BNY Mellon is the Trustee, provides that an "Event of Default" as to the Servicer includes the:

> [F]ailure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer set forth in this Agreement, which continues unremedied for a period of 60 days after the date on which written notice of such breach or failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee or the Depositor or to the Servicer, the Trustee and the Depositor by the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests aggregating not less than 25%.

46.     Under some PSAs, the master servicers were responsible for supervising, monitoring, and/or enforcing the obligations of the servicers.  Events of Default occurred under these PSAs where, despite widespread failures by servicers, the master servicers took no steps to correct these failures, which they required to do under the PSAs.  *See, e.g.*, Exhibit F.

47.     If a servicer/master servicer Event of Default occurs under the PSA of which a responsible officer of U.S. Bank or BNY Mellon, as Indenture Trustees, have received written notice or has actual knowledge, U.S. Bank and BNY Mellon must give prompt written notice to all Certificateholders of the servicer/master servicer Event of Default.  *See* Exhibit H.

**C.     Duties upon an Event of Default**

48.     Once U.S. Bank or BNY Mellon became aware that a servicer or master servicer has committed an Event of Default, their duty of care to Triaxx under the Governing Agreements is significantly increased.  The contractual provisions that Defendants violated are set forth in Exhibit I and are incorporated herein.

49.   For Example, Section 8.1(b) of the CMALT 2006-A4 PSA, for which U.S. Bank is the Trustee, provides that, in the case of a known Event of Default, "Trustee will exercise those rights and powers vested in it by this agreement, and use the same degree of care and skill in their exercise, as a prudent man would exercise under the circumstances in the conduct of his own affairs."

50.   Similarly, in the case of a known Event of Default, Section 8.1 of the FHASI 2006-4 PSA, for which BNY Mellon is the Trustee, provides that: "the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."

51.   Moreover, this heightened duty is not limited or applied only to correcting servicer/master servicer Events of Default.  Instead, under the Governing Agreements, once an Event of Default exists, "[BNY Mellon] shall exercise" all of the "rights and powers vested in it by th[e] [Governing] Agreement[s]," not just those pertaining to the servicer or master servicer.  *Id.*  Thus, BNY Mellon's heightened duty of care also requires it to prudently enforce the R&W claims against the Warrantors as though seeking to protect its own interests.

52.   The rights and powers under the PSAs expressly include Defendants' ability to enforce the rights of the Trusts and Certificateholders as against all parties responsible for harming the Trusts, including by instituting litigation against responsible sellers and servicers (or master servicers).

53.   Under the PSAs, Defendants must also promptly mail to each Certificateholder notice of the Event of Default unless such Event of Default shall have

been waived or cured, or in certain circumstances, if in good faith it determines that

withholding the notice is in the best interests of Certificateholders.

**IV.**

**THE TRUSTS SUFFERED FROM PERVASIVE BREACHES
OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS**

54.     Each of the Trusts' loan pools contains a high percentage of loans

that materially breached R&W's made by the Warrantors, which adversely affected the

value of those mortgage loans.  Specifically, the R&W's concerning the originators'

compliance with underwriting standards and practices, owner-occupancy statistics,

appraisal procedures, loan-to-value ("LTV") and combined loan-to-value ("CLTV")

ratios were systemically and pervasively false.  The falsity of the R&Ws is demonstrated

by: (1) the high default rates of the mortgage loans; (2) the collateral losses suffered by

the Subject Trusts; (3) the downgrades of credit ratings of the RMBS; (4) evidence

highlighting the Sellers' (i) routine abandonment of their underwriting guidelines, (ii)

widespread fabrication of borrower and loan information, (iii) massive breaches of their

representations and warranties, and (iv) engagement in predatory and abusive lending;

and (5) the results of forensic reviews and re-underwriting of loans in other litigation.

**A.     The Trusts' Mortgage Loans Have Experienced
        High Delinquency, Modification, and Loss Severity Rates**

55.     The extremely high delinquency, modification and collateral loss

rates of the mortgage loans within the Subject Trusts are strong evidence of the

Warrantors' misrepresentation of the credit quality and characteristics of the mortgage

loans they sold to the Subject Trusts.  The Subject Trusts have experienced payment

problems significantly beyond what was expected for loan pools that were properly

18

underwritten, and that contained loans matching the characteristics the Warrantors represented.

56.    Loan modifications in the Subject Trusts also dramatically increased beginning in early 2009, providing further evidence of systemic Warrantor breaches of R&Ws to the Subject Trusts.  Loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default.  Loan modifications often include changes to the loan's interest rate, term, and/or outstanding principal.  As with delinquency rates, the extent of loan modifications is indicative of R&W breaches for two reasons.  First, escalating loan modifications correlate to misstated borrower creditworthiness.  Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance, because the original LTV ratio (or CLTV ratio) was not as represented because the appraised property value was misrepresented.

57.    The economic downturn cannot explain the abnormally high percentage of delinquencies, modifications, defaults, foreclosures, and losses observed in the loan pools collateralizing the Subject Trusts.  Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

**B.**      **The Subject Trusts Have Experienced Credit Downgrades**

58.      Significant credit rating downgrades of notes issued by the Subject

Trusts provide strong evidence that the underlying loans were improperly underwritten,

and the notes did not have the credit risk characteristics the Warrantors represented.

59.      Credit ratings are assessments of credit risk published by a rating

agency.  At the time of securitization, all of the RMBS purchased by Triaxx were rated

"investment grade."  *See* Exhibit J.  However, as public disclosures revealed the systemic

underwriting abuses and U.S. Bank and BNY Mellon began reporting severe collateral

losses in the Trusts, the credit rating agencies downgraded the RMBS to below

investment grade designations (commonly referred to as "junk bonds").  *See id*.

**C.**      **The Systemic Disregard of Underwriting
          Standards Was Pervasive during the Relevant Period**

60.      During the height of the mortgage and securitization boom in the

U.S. market between 2004 and 2008, originators of residential mortgage loans sold loans

securitized in RMBS that violated their stated underwriting guidelines and breached the

R&Ws made to the purchasers of the loan pools.

61.      Government and media reports have disclosed the extent of the

loan originators' pervasive abandonment of underwriting standards.  For example, the

Permanent Subcommittee on Investigations in the U.S. Senate released a report detailing

the causes of the financial crisis in 2011.  Using Washington Mutual ("WaMu") as a case

study, the Subcommittee concluded through its investigation:

> Washington Mutual was far from the only lender that sold
> poor quality mortgages and mortgage backed securities that
> undermined U.S. financial markets.   The Subcommittee
> investigation indicates that Washington Mutual was
> emblematic of a host of financial institutions that knowingly
> originated, sold, and securitized billions of dollars in high

risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[5]

62.     Similarly, in January 2011, the Financial Crisis Inquiry Commission ("FCIC") issued its final report that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[6]  The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics."  "Unfortunately - as has been the case in past speculative booms and busts - we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis."  *Id*. at xxii.  The FCIC found:

> [I]t was the collapse of the housing bubble - fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages - that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

63.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007."  *Id*. at xxii.  The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . . ."  *Id*.

---

[5] *Wall Street And The Financial Crisis:  Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

[6] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n (2011) ("FCIC Report").

64.     Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts.

65.     For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan - the largest settlement with a single entity in American history - to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009. As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "that did not comply with the originator's underwriting guidelines" and breached the originator's representations and warranties.

66.     On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009.  The settlement included an agreed-upon statement of facts in which Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

67.     On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and

state civil claims related to Bank of America's conduct in the packaging, securitization,

marketing, sale and issuance of 2,000 RMBS offerings issued prior to January 1, 2009.

The settlement included an agreed-upon statement of facts in which Bank of America

acknowledged that significant percentages of the mortgage loans within the

securitizations contained material defects.

**D.**     **There Is Evidence of Widespread Breaches of**
           **Representations and Warranties by the Trusts' Originators**

68.     Much like other RMBS trusts of the same vintage, the Subject

Trusts have been materially and adversely impacted by the loan origination industry's

widespread underwriting failures.  The originators' systemic sale to the Subject Trusts of

residential mortgage loans in breach of representations and warranties is confirmed

through numerous federal and state government investigations and published reports,

well-publicized news reports, and public and private enforcement actions that have

described rampant underwriting failures throughout the period in which the Subject

Trusts were created and, more specifically, failures by the same originators whose

mortgage loans were sold to the Trusts.

69.     Indeed, the mortgage loans underlying the Subject Trusts were

originated by some of the worst lenders during the relevant time period, including

GreenPoint, Countrywide and Wells Fargo.  Through public and private investigations

and litigation, each of these RMBS lenders have been shown to have systemically

abandoned their own underwriting guidelines during the relevant time period, churning

out billions of dollars in loans with LTVs, owner occupancy status, title condition and

other qualities and characteristics that were materially different than as represented and

saddling RMBS trusts, including the Subject Trusts, with significantly impaired

collateral.  A summary of testimonial and documentary evidence as to each of these

major originators of the mortgage loans to the Trusts is set forth in Exhibit K.

**E.     The Systemic Disregard of Prudent Securitization**
        **Standards Was Pervasive During the Relevant Period**

70.     It is equally well documented that between 2004 and 2008, the

sponsors that securitized the residential mortgages and transferred them into the RMBS

trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure

the mortgage loans were of the same credit quality as represented and complied with

federal and state law.

71.     As the FCIC Report noted:

> The Commission concludes that firms securitizing
> mortgages failed to perform adequate due diligence on the
> mortgages they purchased and at times knowingly waived
> compliance with underwriting standards. Potential investors
> were not fully informed or were misled about the poor
> quality of the mortgages contained in some mortgage-related
> securities.  These problems appear to have been significant.

FCIC Report at 187.

72.     As made clear in the FCIC Report, RMBS sponsors and their third-

party due diligence providers failed to analyze adequate sample sizes of the loan pools,

sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the

sponsors' and their due diligence firms identified high percentages of mortgage loans in

their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to

preserve their business relationships with the originators or to keep the defective loans off

their own books.  Consequently, by 2011, it was apparent to all players in the U.S. RMBS

industry, including Defendants, that the mortgage loans deposited in Subject Trusts

issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

**F.     There Is Evidence of Widespread Breaches of Representations and Warranties by the Specific Sponsors of the Trusts**

73.     As with other RMBS trusts of the same vintage, the Subject Trusts have been materially impacted by the sponsors' faulty securitization practices.  The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically failures by the same sponsors whose mortgage loans were deposited into the Trusts.

74.     In fact, it is now well-known that in connection with the securitization of loans for RMBS trusts, including those at issue here, the Trusts' major sponsors, JPMorgan, Credit Suisse, First Horizon and Lehman, systemically disregarded their own and third-party due diligence reports reflecting the defective nature of the underlying mortgage loans, and as a result materially breached representations and warranties contained in the Governing Agreements.  A summary of testimonial and documentary evidence as to Credit Suisse and Lehman as sponsors of the RMBS is set forth in Exhibit L.

## V.

## DEFENDANTS KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

75.     There is ample evidence that beginning in 2009 and by 2011, Defendants knew that each of the Trusts' loan pools contained high percentages of

mortgage loans that materially breached the sellers' R&Ws regarding their characteristics and credit quality.

## A.    Reports, Investigations and Litigation Involving the Sellers

76.    Since 2009 there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices.  As a result of the publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the originators and sponsors, U.S. Bank, BNY Mellon, and their responsible officers knew that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller R&Ws.

## B.    Defendants Monitored the Performance of the Trusts

77.    U.S. Bank and BNY Mellon had discovered by 2009 that the Subject Trusts' loan pools were afflicted by severe and pervasive R&W breaches by virtue of the Trusts' poor performance.  As noted above, it was evident by January 2009 that given the extremely high mortgage loan delinquency, modification, default, foreclosure and loss severity rates within the Trusts' loan pools, the mortgage loans sold to the Trusts were not as the sellers had represented and warranted.

78.    U.S. Bank and BNY Mellon were aware of these events as they monitored the Subject Trusts' performance.  For example, they were provided with regular reports regarding the performance of the mortgage loans in each of the Subject Trusts by the servicers/master servicers and other of its agents.  In addition, they published monthly reports of the performance of the mortgage loans in each of the Subject Trusts, which included delinquent loans, loans that had gone into foreclosure and those which had realized losses upon the sale of their collateral.  Moreover, U.S. Bank

and BNY Mellon were aware of the credit ratings for the Subject Trusts because as part

of the rating agencies' ongoing surveillance and monitoring of the Subject Trusts, U.S.

Bank and BNY Mellon fielded inquiries and provided detailed data to the rating agencies

so that they could make informed decisions on their downgrading of the Notes.

### C.      Defendants Received Written Notice of Pervasive and Systemic Seller Breaches from Financial Guaranty Insurers

79.      U.S. Bank and BNY Mellon also discovered that the Subject

Trusts' loan pools contained high percentages of mortgage loans that materially breached

the originators' and sponsors' representations and warranties through their involvement

in financial guaranty insurer litigation involving these same originators and sponsors, in

its capacity as either trustee or master servicer.

80.      Financial guaranty insurers provide financial guaranty insurance

for RMBS issued from many of the Subject Trusts.  Under the Governing Agreements for

these insured RMBS, the mortgage loan sellers to the Trusts made numerous

representations and warranties concerning the quality and origination practices for the

mortgage loans.  The Governing Agreements for the insured RMBS also create a

repurchase protocol pursuant to which the monoline insurers must provide notice of a

breach of representation and warranty to the responsible mortgage loan seller and the

parties to the Governing Agreement (including the Trustee), in order to compel the

responsible mortgage loan seller to repurchase loans that breach representations and

warranties.  These breach notices were sent and they were received by Defendants.

81.      Monoline insurers have initiated at least ten lawsuits against

responsible mortgage loan sellers for breach of their R&Ws in connection with other

RMBS trusts to which U.S. Bank serves either as master servicer or trustee.[7]  Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike Certificateholders) were often able to obtain access to the specific loan files or conduct a forensic loan level review of the loans, which showed systemic breaches of the representations and warranties.

82.     The monoline insurers' findings from loan level reviews, set forth both in their breach notices and subsequent publicly available lawsuits, made Defendants and their responsible officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry between 2004 and 2008, and informed them of specific originators' and sponsors' systemic and pervasive practice of disregarding loan underwriting guidelines.

83.     BNYM and its responsible officers gained knowledge of these suits and the allegations made against these mortgage loan sellers because BNYM was named as a defendant in these lawsuits.  For example, on March 19, 2009, monoline insurer United Guaranty Indemnity Company ("United Guaranty") brought suit against Countrywide and BNYM in connection with mortgage loans originated and securitized by Countrywide.  Complaint, *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp., et al.*, No. 09-01888 (C.D. Cal. July 15, 2009).  In its amended complaint, United

---

[7] *See, e.g., CIFG Assurance N. Am., Inc. v. Bank of Am., N.A., et al.*, No. 654028/2012 (N.Y. Sup. Ct.); *Assured Guar. Corp. v. EMC Mortg. LLC*, No. 1:12-cv-01945 (S.D.N.Y.); *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital*, No. 652837/2011 (N.Y. Sup. Ct.); *Ambac Assurance Corp., et al. v. First Franklin, et al.*, No. 651217/2012 (N.Y. Sup. Ct.); *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct.); *MBIA Ins. Corp. v. Credit Suisse Sec. (USA), LLC, et al.*, No. 603751/2009 (N.Y. Sup. Ct.); *Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 1:12-cv-01579 (S.D.N.Y.); *MBIA Ins. Corp. v. Morgan Stanley, et al.*, No. 29951/2010 (N.Y. Sup. Ct.); *Fin. Guar. Ins. Co. v. Ally Fin., Inc.*, No. 12-cv-0338 (S.D.N.Y.); and *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital*, No. 652837/2011 (N.Y. Sup. Ct.).

Guaranty alleged that "Countrywide's failure to abide by any standard of care in its loan origination practice dramatically changed the risk profile" of the insured loans. *Id.* at ¶ 9. In support of this contention, United Guaranty alleged that its internal review revealed that over 55% of mortgage loans audited failed to comply with Countrywide's underwriting guidelines or contained some material defect misrepresenting the credit quality and characteristics of mortgage loans. *Id.* at ¶ 68.

**D.    Defendants and Their Responsible Officers Received Written
       Notice from Investors Of Pervasive and Systemic Seller Breaches**

84.    In its capacity as trustee to other RMBS trusts, U.S. Bank and BNY Mellon received written notice from RMBS investors of breaches of representations and warranties by the very same originators and sponsors that originated and sponsored the loans underlying the Subject Trusts.  Based on the sheer volume of the defective mortgage loans identified, together with the systemic faulty origination and securitization practices complained of in the investors' breach notices, Defendants and their responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

85.    For example, Defendants and their responsible officers have had knowledge of extensive R&W breaches, since at least December 15, 2011, when, on information and belief, they received written notice from a group of institutional investors that large numbers of ineligible loans were deposited in the Subject Trusts, and hundreds of other trusts, and that JP Morgan Chase & Co. had failed to meet its obligations as servicer.

**E.      U.S. Bank Selectively Asserted the Trusts'**
         **Repurchase Rights against Insolvent Sellers**

86.      U.S. Bank's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by its own actions in 2009.  For example, in 2008, Lehman, a sponsor for RMBS Trusts filed for bankruptcy.  In connection with Lehman's bankruptcy, U.S. Bank, Wilmington Trust Company, Wilmington Trust, National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, in their capacity as trustee, separate trustee or indenture trustee (collectively, the "Lehman Bankruptcy RMBS Trustees"), filed proofs of claims, asserting that Lehman was liable to 405 trusts for breaches of representations and warranties for all 1 million of the mortgage loans underlying these Trusts.

87.      U.S. Bank was the Trustee for at least 232 of these 405 trusts, two of which are Trusts at issue here.  In pursuing these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a sample of nearly 5,000 loans in 255 of the 405 RMBS trusts that suffered losses.  The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans.  U.S. Bank was the Trustee for 168 of the 255 trusts subject to this review.

88.      Lehman was not liable for all of the mortgage loans in most of those trusts; there were many other solvent originators to those trusts who had made representations and warranties for those mortgage loans and were thus liable for them.  Nonetheless, U.S. Bank has not pursued any of those third party originators to enforce

representation and warranty claims as to the thousands of breaching mortgage loans in Lehman-label Trusts.[8]

89.     Similarly, in the bankruptcy proceedings for Thornburg, *In re: Thornburg Mortgage Inc.*, No. 09-17787 (D. Md.), Bank of America, the predecessor indenture trustee, originally filed proofs of claim for the repurchase of loans in all three Thornburg-label Trusts at issue.  These claims were transferred to U.S. Bank, as indenture trustee for these trusts, on December 9, 2011.  Solvent originators to those trusts similarly made representations and warranties for these mortgage loans and were thus liable for them, including Countrywide and First Republic Bank.  Despite U.S. Bank's knowledge of the defective loans in these trusts, U.S. Bank inexplicably did not pursue repurchase claims against these entities.

**F.     U.S. Bank and BNY Mellon Initiated Putback
        Litigation against Many of the Sellers**

90.     As reflected by Exhibit M, U.S. Bank has participated in at least 15 actions to enforce putback (*i.e.*, repurchase) rights for other RMBS trusts that involved the same originators, sponsors, and/or servicers as the Trusts at issue in this action.[9]  In each of the putback actions, loan level reviews were conducted which identified breach rates exceeding 50% in every offering, including those sponsored by the same sponsors as the Trusts and involving loans originated and sold by the same originators and

---

[8] Given that U.S. Bank filed claims against Lehman in the bankruptcy case for at least two Trusts, Plaintiffs do not allege that U.S. Bank breached the Governing Agreements by failing to make representation and warranty claims against Lehman for the Trusts.  However, Plaintiffs do allege that U.S. Bank breached the Governing Agreements by failing to make representation and warranties claims against the many other responsible parties, including, solvent sellers and solvent servicers to the Lehman-label Trusts.

[9] Trusts at issue in the limited putback claims pursued by U.S. Bank are not included in this action, except for those trusts where putback claims have been adjudged or are subject to dismissal as untimely-filed by U.S. Bank.

sponsors as the Trusts.  Based on its involvement in these putback actions, which alleged pervasive and systemic breaches of representations and warranties, U.S. Bank was aware of similarly pervasive and systemic breaches of representations and warranties in the Trusts.

91.     BNYM participated in at least three actions to enforce putback rights for other RMBS trusts that involved the same originators, sponsors, sellers and/or servicers as the Trusts at issue in this action.  Based on its involvement in these putback actions, which alleged pervasive breaches of representations and warranties, BNYM was aware of similarly pervasive R&W breaches in the Subject Trusts.

92.     In each of the putback actions, loan level reviews were conducted which identified breach rates as high as 99%, including those sponsored by the same sponsors as the Trusts and involving loans originated and sold by the same originators and sponsors as the Trusts.  The offerings discussed below are at issue in this action.  In one such putback action against WMC, BNYM asserted that of the 498 origination files reviewed thus far, 493 mortgage loans [99%] materially breach one or more of WMC's representations and warranties.  Complaint, *The Bank of New York Mellon, solely as Sec. Admin. For J.P. Morgan Mortg. Acquisition Trust 2006-WMC4*, Index No. 654464/2012, Exhibit E (N.Y. Sup. Ct. Feb. 24, 2013).  BNYM further alleged that a review of an additional 350 origination files revealed material breaches in 347 or 99% of the WMC loans.  "The enormity of defective loans uncovered to date strongly indicates systemic breaches throughout the collateral underlying the Trust."  *Id*. at Exhibit F.

G.    **U.S. Bank Learned of Widespread Seller Breaches of**
       **Representations and Warranties in its Capacity as Servicer/Master Servicer**

93.    In addition to acting as a trustee, U.S. Bank is among the largest

mortgage loan servicers/master servicers to the RMBS industry during the relevant

period.  Indeed, U.S. Bank's master servicing portfolio includes approximately 45,700

loans with an unpaid principal balance of approximately $6 billion as of January 2014.

Many of these loans were originated and sponsored by the mortgage loan sellers to the

Trusts.  In servicing these loans, U.S. Bank would obtain direct knowledge of the

mortgage loan sellers' shoddy underwriting and securitization practices.

94.    For example, as servicer to RMBS trusts containing loan pools

originated and securitized by the same mortgage loan sellers to the Subject Trusts, U.S.

Bank prepared monthly reports for the trustees detailing the similarly poor performance

of the loan pools.  Additionally, as servicer, U.S. Bank knew the credit rating agencies'

were downgrading these trusts as a result of the poor credit quality of the same

originators' and sponsors' loan pools.  Further, in servicing and administrating the loans,

including during the modification process, U.S. Bank examined the loan files of

mortgage loans originated and sponsored by these entities and in the process discovered

systemic and pervasive breaches of representations and warranties in the loan pools.

**VI.**

**THE TRUSTS SUFFER FROM PERVASIVE SERVICER/MASTER SERVICER**
**VIOLATIONS**

95.    The Subject Trusts suffer from ongoing servicer/master servicer

Events of Default caused by the servicers' and/or master servicers' failure to observe and

perform, in material respects, the covenants and agreements imposed on them by the

Governing Agreements.  The servicers' and master servicers' breach of their covenants is

33

confirmed through federal and state government investigations and published reports,

well publicized news reports, and public and private enforcement actions that have

described RMBS servicers' pervasive deviation from usual, customary and lawful

servicing practices in their administration of mortgages and, more specifically, illegal and

illicit servicing activities by the same servicers who service the loans held by the Trusts.

A.      **The Servicers/Master Servicers Failed to Give Notice of Seller**
        **Breaches of Representations and Warranties**

96.     As with the Trustee, the PSAs require the servicers/master

servicers to give prompt written notice to all parties to the PSAs of R&W breaches made

by a seller in respect of the mortgage loans that materially and adversely affects the value

of any mortgage loan or the interests of the Certificateholders in any such mortgage loan,

upon the servicer's or master servicers' discovery of such breach.

97.     In many cases, the servicers/master servicers are affiliates of the

sellers because in connection with the sale of a loan pool, the seller secured the retention

of servicing rights to loans for its servicing division.  These servicers/master servicers

had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and

securitization practices, and therefore had actual knowledge at the time of the Trusts'

purchase of these loans that the sellers included high percentages of defective loans

within the loan pools.  These servicers/master servicers failed to notify parties to the

PSAs of the discovery of mortgages that were in violation of applicable R&Ws at the

time they were purchased by the Subject Trusts, and failed to enforce the sellers'

repurchase obligations, despite their awareness of loans that were in violation of

representations and warranties.

98.     Further, as noted above, the servicers/master servicers have regularly modified mortgage loans held by the Subject Trusts.  Upon information and belief, in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller R&Ws because the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay.  Thus, in the process of performing loan modifications, the servicers/master servicers discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages. Nevertheless, the servicers/master servicers systemically failed to notify the other parties of these breaches.

99.     As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers/master servicers aware of material seller breaches representations and warranties within the Subject Trusts' loan pools. Nevertheless, the servicers/master servicers have not notified the other parties to the PSAs of these seller breaches or enforced the sellers' repurchase obligations.

100.     Further, the servicers/master servicers have been specifically notified by monoline insurers of pervasive breaches by the sellers.  Notwithstanding the servicers'/master servicers' "discovery" of material breaches of representations and warranties, they have not notified the other parties to the PSAs of these breaches.

101.     The systemic failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations have

materially affected the rights of the Subject Trusts and Triaxx in that they have deprived the Trusts of mortgage loans of adequate credit quality, or alternatively funds representing the "Repurchase Price" under the Governing Agreements, with respect to each defective mortgage loan.

**B.**     **The Servicers/Master Servicers Have Violated Their Prudent Servicing Obligations**

102.     The PSAs require that the servicer service and administer the mortgage loans (or, in the case of the master servicer, that they oversee such servicing) for and on behalf of the Certificateholders (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicer to receive compensation or other fees for its services under the PSA, the obligation of the servicer to make servicing advances under the PSA, and the servicer's ownership, servicing or management for others of any other mortgage loans.

103.     As demonstrated by Exhibit M, highly publicized government enforcement actions, private litigation and settlements involving the servicers demonstrate that the servicers systemically violated these prudent servicing obligations.

104.     The servicers' pervasive failure to observe their prudent servicing obligations (and the master servicers' failure to oversee and ensure prudent servicing occurred) have materially affected the rights of the Subject Trusts and all

Certificateholders in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

**C.**      **The Servicers Have Violated Their Foreclosure Obligations**

The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. Moreover, each of the PSAs contemplate that foreclosures and liquidations of defaulted mortgages proceed promptly and in accordance with applicable law, provided the documentation is in order.

105.      Servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them. Indeed, in several states, the average days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled. The servicers' delay in foreclosing has allowed the servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the servicers' breach of their duties.

106.      The servicers' systemic violation of their foreclosure obligations have materially affected the rights of the Subject Trusts and Triaxx in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents. The Subject Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. The Subject Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

**D.**     **The Servicers Have Violated Their Modification Obligations**

107.    The PSAs provide that the servicers agree to a modification of any mortgage loan only in certain specified circumstances.  When modifications are required to remedy predatory lending or foreclosures violations, the PSAs require that the seller or the servicer - and not the Trusts or the Certificateholders - bear the costs to cure such breach.

108.    The servicers have also breached the PSAs by agreeing to modify loans held in the Trusts for the purpose of settling claims related to their wrongful servicing and foreclosure practices made by various attorneys general.

109.    The servicers' violation of their modification obligations (and the master servicers' failure to remedy these violations) have materially affected the rights of the Subject Trusts and Triaxx in that the servicers, master servicers, and their parent companies have been unjustly enriched to the detriment of the Trusts and Certificateholders by using Trust collateral to settle claims that are not, and could never be, made against the Trusts.

**E.**     **The Servicers Have Abused Their Servicing Advances Obligations**

110.    The PSAs provide that the servicers are to advance P&I on a loan only if they determine that the advance payment is recoverable.  The PSAs further provide that the servicers may only recover servicing advances that are customary, reasonable and necessary expenses incurred in the performance of their servicing obligations.

111.    The servicers have abused their advancing authority to enrich themselves to the direct detriment of the Subject Trusts.  In particular, the servicers have manipulated the recoverable designation to their advantage.  During periods of low

interest rates, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Subject Trusts' loan pools and the servicers could continue to earn their servicing fees on these loans, which exceed the relatively low cost of financing the advances on these delinquent loans. However, when interest rates have increased, the servicers have strategically switched the mortgage loans' designation from recoverable to unrecoverable. The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Subject Trusts.

112.   The Trusts and their Certificateholders are harmed by the servicers' manipulation of the recoverable designation (and the master servicers' failure to remedy these violations) because the Trusts incur more interest rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the PSAs.

113.   Finally, despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors, who marked up their services to a level above the market price - to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent effort to supplement its servicing income. These improper servicing advancing have added to the Subject Trusts' losses.

## VII.

## DEFENDANTS HAVE KNOWN OF SERVICING/MASTER SERVICING VIOLATIONS

114.   There is ample evidence that, beginning in early 2009 and continuing to the present, Defendants and their responsible officers have known of the

above described widespread and severe failures on the part of the servicers/master

servicers to observe or perform in material respects their obligations under the PSAs.

A.       **Reports, Investigations and Litigation Involving the Servicers**

      115.    U.S. Bank, BNY Mellon, and their responsible officers knew of the

servicers' improper servicing practices from the steady stream of public disclosures

regarding the servicers' violations.  *See* Exhibit N.

B.       **U.S. Bank Was Involved in Government Enforcement Actions**
       **and Private Litigation Stemming from the Servicers' Violations**

      116.    U.S. Bank and its responsible officers knew of the servicers'

improper servicing practices because U.S. Bank and its affiliates, in their capacity as

servicers to other RMBS trusts, were targets in highly publicized government

investigations, prosecutions and settlements.  For example, along with thirteen other of

the nation's largest servicers, the government agencies found deficiencies in U.S. Bank's

servicing/master servicing and foreclosure processes, brought a formal enforcement

action against U.S. Bank, and participated in a joint settlement including Aurora, Bank of

America, Citibank, Goldman, HSBC, JPMorgan, MetLife Bank, Morgan Stanley, PNC,

Sovereign, SunTrust, U.S. Bank, and Wells Fargo. U.S. Bank's involvement in such

proceedings would have made it acutely aware of the deficiencies of each of the other

servicers subject to these actions.

      117.    U.S. Bank and its responsible officers also knew of the servicers'

improper servicing practices through its involvement in litigation highlighting servicing

failures, such as in judicial foreclosure proceedings exposing the servicers' failure to

correct irregularities in the chain of title.  For example, courts across the country have

repeatedly prohibited U.S. Bank from foreclosing on mortgaged properties due to

irregularities in the chain of title of loans serviced by Wells Fargo.  *See, e.g., U.S. Bank*

*N.A. v. Duvall*, 2010 Ohio App. LEXIS 5461, at P15 (Ohio Ct. App. Dec. 30, 2010)

(court affirmed dismissal of U.S. Bank's action to foreclose on grounds that affidavits by

servicer Wells Fargo were insufficient to prove U.S. Bank owned mortgage at the time it

filed the foreclosure action); *U.S. Bank N.A. v. Nelson*, 2014 Wis. App. LEXIS 168, at *8

(Wis. Ct. App. Feb. 27, 2014) (reversing summary judgment of foreclosure in favor of

U.S. Bank due to insufficient affidavit of servicer Wells Fargo demonstrating the

declarant lacked personal knowledge concerning how foreclosure records were created);

*U.S. Bank Nat'l Ass'n v. De Los Rios*, 2014 N.Y. Misc. LEXIS 218, at *11 (N.Y. Sup. Ct.

Jan. 9, 2014) (denying U.S. Bank's motion for summary judgment in part, based on

insufficient affidavit from servicer Wells Fargo, which provided no explanation "as to

why a different version of the note" was produced at different times during the litigation);

*Bank of Am. N.A. v. Lam*, 2013 N.Y. Misc. LEXIS 6239, at *19-20 (N.Y. Sup. Ct. Dec. 9,

2013) (Successor trustee U.S. Bank's motion for summary judgment denied on grounds

that servicer Wells Fargo's affidavit was defective); *U.S. Bank Nat'l Ass'n v. Maynard*,

No. 18007/2006 (N.Y. Sup. Ct., Kings Cnty. Nov. 26, 2007) (U.S. Bank's motion for

judgment of foreclosure denied on grounds that servicer Wells Fargo's affidavits and

limited power of attorney were "defective" and raised issue whether Wells Fargo affiant

"might be engaged in a subterfuge").

       118.    These and other public enforcement actions and private litigation

highlighting the servicers' improper servicing practices were well known throughout the

RMBS industry, including by U.S. Bank and BNY Mellon.  For example, in October

2010, Deutsche Bank (trustee for more than 1,000 RMBS trusts) issued a notice to all

RMBS investors in trusts for which Deutsche Bank served as trustee confirming

Deutsche Bank's awareness of ongoing government investigations into improper

servicing practices.  Deutsche Bank's notice acknowledged that it had been "widely

reported in the news media" that "several major U.S. loan servicers" had "suspended

certain foreclosures in some or all states" due to allegations and investigations regarding

"defects in foreclosure practices, procedures and/or documentation."  Also in October

2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of

mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee.  In

the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the

servicers] immediate attention" – specifically, the same "serious . . . defects in

foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's

notice.  The memorandum referred to the expansive scope of the reported servicer

deficiencies, and admitted that foreclosure abuses such as the execution and filing by

servicers or their agents of documents containing untrue assertions of fact "would

constitute a breach of that Servicer's obligations under the [Governing Agreements] and

applicable law."

**C.     Defendants and Their Responsible Officers Received Written Notice
from RMBS Investors of Pervasive and Systemic Servicer Breaches**

119.     In their capacity as trustees, Defendants and their responsible

officers repeatedly received written notice from RMBS investors of the systemic

servicing violations described above perpetrated by the very same servicers for the

Subject Trusts.  Based on the RMBS investors' breach notices, Defendants and their

responsible officers knew that servicers were engaged in the same wrongful conduct in

connection with their servicing of the loans for the Trusts.

120.     Defendants and their responsible officers have had knowledge of extensive servicing/master servicing breaches, since at least December 15, 2011, when, on information and belief, they received written notice that large numbers of ineligible loans were deposited in the Subject Trusts, and hundreds of other trusts, and that JP Morgan Chase & Co. had failed to meet its obligations as servicer.

121.     In addition, on January 5, 2012, an investor group directed U.S. Bank and another RMBS trustee to investigate, among other things, Wells Fargo's improper servicing practices for over $19 billion of RMBS issued by various affiliates of Wells Fargo.  Similarly, on January 31, 2012, an investor group directed U.S. Bank and Wells Fargo, in their capacity as trustees, to investigate, among other things, Wells Fargo's and others' deficient loan servicing for Morgan Stanley-sponsored RMBS.

122.     On September 19, 2012, an investor group sent a Notice of Non-Performance ("September 19, 2012 Notice") to U.S. Bank and other RMBS trustees, identifying breaches by Wells Fargo of specific servicing covenants in the Governing Agreements for 149 Morgan Stanley- and Wells Fargo-sponsored RMBS.  The September 19, 2012 Notice alleged that each of these servicing failures had materially affected the rights of the bondholders and constituted ongoing events of default in the servicer's performance under the relevant Governing Agreements.

**D.      Defendants Had Knowledge of the Servicers' Failures
through the Monthly Servicer and Remittance Reports**

123.     Defendants and their responsible officers also knew of the servicers' improper servicing practices (and thus the master servicers' failures) through the servicers' servicing reports and the monthly remittance reports, which Defendants and their agents published.  These reports detailed not only the Trusts' increasing

modifications, staggering losses and write-downs due to the poor credit quality of the loans.

## VIII.

### DEFENDANTS HAVE KNOWN
### OF THE OCCURRENCE OF NUMEROUS EVENTS OF DEFAULT

124.    Beginning in early 2009 and continuing to the present, Defendants and their responsible officers have known of the above described Events of Default.

125.    Each month, Defendants, as Trustee, prepared cash distribution summaries that detailed the growing rate of mortgage loan delinquencies, modifications, defaults, foreclosures, servicing advances and fees, and realized credit losses in each of the Trusts.  These summaries were also required to identify any mortgage loan that had been repurchased by a responsible seller, or received a credit from the responsible servicer.

126.    However, because no repurchasing or crediting occurred, Defendants knew that there were enormous unresolved problems with the credit quality, servicing and administration of the mortgage loans in the Trusts, that defective mortgage loans were not being repurchased by the Sellers, and that the Trusts were not being reimbursed for losses attributable to servicing violations.

## IX.

### DEFENDANTS FAILED TO DISCHARGE
### THEIR CONTRACTUAL AND EXTRA-CONTRACTUAL DUTIES

127.    Despite Defendants' knowledge of the Subject Trusts' default rates, downgrade to "junk" status, R&W breaches and servicer violations.  Defendants failed to perform their contractual and extra-contractual duties to protect the Trusts and Certificateholders.

A.   **Failure to Initiate the Trusts'**
     **Repurchase Rights against Responsible Sellers**

128.   As set forth above, beginning in 2009 and by 2011, Defendants and their responsible officers discovered that the Subject Trusts contained loans that materially breached the Warrantors' representations and warranties, adversely affected the value of those mortgage loans.  Defendants breached their contractual duty by failing to (i) provide notice to the parties to the Governing Agreements and/or the Warrantors upon discovery of these breaches, and (ii) take any further action with respect to the sellers' repurchase of the defective mortgage loans.

B.   **Failure to Provide Notice to the**
     **Servicers/Master Servicers of  Events of Defaults**

129.   As set forth above, beginning in 2009 and continuing to the present, Defendants and their responsible officers knew of failures on the part of the servicers and master servicers to observe or perform in material respects their covenants or agreements in the PSAs, including the (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery thereof and enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of modification obligations; and (v) improper servicing advances.  Defendants knew that these servicer and master servicer breaches were material and could give rise to "Events of Defaults" as defined by the PSAs.

130.   Defendants breached their contractual duty by failing to provide notice to the servicers and master servicers of these defaults and Events of Defaults and terminating the servicers/master servicers.

C.      **Failure to Act Prudently**
        **Subsequent to Events of Defaults**

131.    As set forth above, beginning in 2009 and continuing to the present, Defendants and their responsible officers have known of uncured and continuing Events of Default as a result of the servicers' numerous breaches under the PSAs. Consequently, under the PSAs, Defendants had and continue to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

132.    A prudent person would have taken action to protect the Subject Trusts and their Certificateholders from the known Warrantor breaches of representations and warranties by exercising all of their rights under the Governing Agreements to enforce the sellers' repurchase obligations, including timely initiation of an investigation to determine all of the materially breaching mortgage loans and bringing suit against the sellers for specific performance to compel repurchase of those loans.  Defendants breached their contractual duty by failing to act prudently and take these actions.

133.    A prudent person would have also taken action to protect the Subject Trusts and their Certificateholders from the known servicer violations by exercising all of its rights under the Governing Agreements to enforce the servicers' prudent servicing obligations, including ensuring that all Servicer Events of Default were cured, terminating the servicers, substituting itself as the substitute servicer or replacing the servicers, and enforcing the servicers' obligations to reimburse the Subject Trusts for losses caused as a result of their breaches through suit if necessary.  Defendants breached their extra-contractual duties by failing to act prudently and taking these actions.

134.     In addition to abiding by all of the obligations under the Governing Agreements, a prudent person also would have taken actions that were not mandated by those agreements, but that would have protected the Subject Trusts and their Certificateholders, including but not limited to: (i) preserving records of the Trustee and demanding that that Warrantors, servicers/master servicers and custodians do the same; (ii) hiring financial and legal advisers to determine the scope and severity of representation and warranty breaches and servicing failures among the trusts they administer; (iii) identifying potential adverse parties and estimating their solvency; (iv) developing viable legal theories of recovery and understanding applicable statutes of limitation; (v) based on the above, creating a strategy for recovery across all of the Subject Trusts; and (vi) executing that strategy in order to protect the Subject Trusts and Certificateholders.   Defendants failed to take any such action.

**D.      Failure to Provide Notice to Certificateholders
          of the Uncured Events of Defaults**

135.     As set forth above, known Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, Defendants also had and continue to have the obligation to provide all Certificateholders with notice of these Events of Default.

136.     Defendants had no good faith reason for failing to provide notice of these Events of Defaults to the Certificateholders.  Consequently, Defendants breached their contractual and fiduciary duties by failing to provide all Certificateholders with notice of these Events of Default.

## X.

## DEFENDANTS NEGLIGENTLY FAILED TO AVOID CONFLICTS OF INTEREST

137.   The Defendants failed to discharge their pre- and post-default duties owed to the Subject Trusts and Certificateholders because acting to protect the interests of the Trusts would have conflicted with their own interests.

### A.   U.S. Bank Was Engaged in the Same Wrongful Servicing Activities

138.   U.S. Bank failed to take action to protect the Subject Trusts and their Certificateholders against R&W breaches and servicer/master servicer violations because it would have exposed that U.S. Bank itself was engaged in the same servicing misconduct in its role as servicer/master servicer for other mortgages and RMBS trusts.

139.   In 2010, governmental agencies conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at U.S. Bank. The reviews uncovered significant problems in foreclosure processing at U.S. Bank, including "critical weaknesses in [U.S. Bank's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[10]

140.   On April 13, 2011, based on the deficiencies in the review and risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S. Bank, to address its pattern of misconduct and negligence related to deficient practices in

---

[10] *See* Interagency Review of Foreclosure Policies and Practices (Apr.  2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104 13.pdf.

residential mortgage loan servicing and foreclosure processing.  According to the Federal Reserve Board press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [U.S. Bancorp]."  The enforcement action required U.S. Bancorp to improve its residential mortgage loan servicing and foreclosure practices.

141.    As part of the enforcement action, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities."

142.    In addition, the OCC entered into consent orders with U.S. Bank and several other servicers (the "OCC Consent Orders").  In the OCC Consent Order with U.S. Bank, the government found, among other things, that beginning in 2009 U.S. Bank filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training for its foreclosure-related services.

143.    Despite pledging to reform its servicing misconduct and foreclosure abuses four years ago, U.S. Bank has still failed to comply with applicable federal regulatory standards.  On June 17, 2015, the OCC announced that it was imposing further restrictions on the mortgage servicing operations of U.S. Bank and five other banks for failing to meet the requirements of the prior consent orders and "continu[ing] to engage in unsafe and unsound practices" in violation of the prior consent orders.[11]

---

[11] *See* Press Release, Office of Comptroller of Currency, *OCC to Escheat Funds from the Foreclosure Review, Terminates Orders Against Three Mortgage Servicers, Imposes Restrictions on Six Others*

144.    In short, because U.S. Bank itself was engaging in the same illicit and improper acts as the servicers for the Trusts, U.S. Bank failed to enforce the servicer violations, or even alert the Certificateholders to the servicers' misconduct.

**B.      U.S. Bank Originated Defective Loans**

145.    U.S. Bank, as an originator for other RMBS trusts, sold hundreds of millions of dollars of loans, many of which materially breached representations and warranties.  Accordingly, U.S. Bank itself faced enormous repurchase liability for hundreds of millions of dollars of loans sold in breach of representations and warranties, including U.S. Bank-originated loans in RMBS trusts.

**C.      Defendants Were Economically
         Beholden to the Mortgage Loan Sellers**

146.    Trustees are selected by the sponsor, which is often an affiliate of the servicer.  Although U.S. Bank and BNY Mellon were charged with representing the interests of the Trusts and all Certificateholders, it was economically beholden to the sponsors.  Indeed, U.S. Bank and BNY Mellon had close, repeat business relationships with most, if not all, of the sponsors.  Between 2003 and 2009, private-label RMBS offerings totaled more than $3 trillion.

147.    However, only a handful of U.S. financial institutions served as trustees and reaped significant fees.  U.S. Bank had the second largest market share at 17% of the $3 trillion market, and BNY Mellon was third at 13%.  In short, U.S. Bank and BNY Mellon failed to protect the Subject Trusts because they did not want to risk losing significant business from the sponsors of RMBS Trusts generally.

---

(June 17, 2015), *available at* http://www.occ.gov/news-issuances/news- releases/2015/nr-occ-2015-85.html.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract against U.S. Bank)

148.    Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

149.    The Governing Agreements are contracts setting forth the duties U.S. Bank owed to Triaxx and the Subject Trusts.

150.    Under the Governing Agreements, U.S. Bank was required to perform certain duties, including, without limitation, the duties to:

(a)    give notice to parties to the Governing Agreements of the Warrantors' breaches of R&Ws concerning the Mortgage Loans upon U.S. Bank's discovery, and/or take required action to effectuate the cure, substitution or repurchase of any and all defective Mortgage Loans;

(b)    notify the Master Servicers and Servicers of their Events of Default upon obtaining knowledge of such default and seeking the cure of said Event of Default;

(c)    notify Triaxx and other certificateholders of Events of Default and the Warrantors' breaches/defaults;

(d)    take prudent actions, including without limitation to terminate or replace Master Servicers and Servicers that fail to cure their Events of Default, and taking prudent actions to enforce the Warrantors' R&Ws; and

(e)    exercise all of its rights and powers under the Governing Agreements during an Event of Default for the benefit of Triaxx and other

certificateholders as a reasonable, prudent person would in the conduct of his or her own affairs.

151.    U.S. Bank and its responsible officers discovered and had actual knowledge of the Warrantors' breaches of their R&Ws, the Master Servicers' and Servicers' breaches, and Events of Default, as alleged above.

152.    Notwithstanding that knowledge, U.S. Bank failed to perform its duties under and therefore breached the Governing Agreements.

153.    U.S. Bank's breach of its duties under the Governing Agreements deprived the Subject Trusts and Triaxx of the consideration they bargained for, *e.g.*, they did not receive RMBS that were collateralized by Mortgage Loans which were warranted to be of a certain credit quality, and breaches of these R&Ws were not enforced as required by the Governing Agreements.

154.    These breaches of the Governing Agreements by U.S. Bank directly and proximately caused Triaxx to suffer damages, among other things, in the form of losses to the value of the certificates.

155.    U.S. Bank has engaged in continuing breaches of the Governing Agreements by failing to fulfill its duties.

156.    As a result of U.S. Bank's breaches of contract, judgment should be entered in favor of Triaxx and against U.S. Bank in an amount to be proven at trial but not less than $222.2 million.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract against BNY Mellon)

157.    Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

158.    The Governing Agreements are contracts setting forth the duties BNY Mellon owed to Triaxx and the Subject Trusts.

159.    Under the Governing Agreements, BNY Mellon was required to perform certain duties, including, without limitation, the duties to:

(f)    give notice to parties to the Governing Agreements of the Warrantors' breaches of R&Ws concerning the Mortgage Loans upon BNY Mellon's discovery, and/or take required action to effectuate the cure, substitution or repurchase of any and all defective Mortgage Loans;

(g)    notify the Master Servicers and Servicers of their Events of Default upon obtaining knowledge of such default and seeking the cure of said Event of Default;

(h)    notify Triaxx and other certificateholders of Events of Default and the Warrantors' breaches/defaults;

(i)    take prudent actions, including without limitation to terminate or replace Master Servicers and Servicers that fail to cure their Events of Default, and taking prudent actions to enforce the Warrantors' R&Ws; and

(j)    exercise all of its rights and powers under the Governing Agreements during an Event of Default for the benefit of Triaxx and other certificateholders as a reasonable, prudent person would in the conduct of his or her own affairs.

160.    BNY Mellon and its responsible officers discovered and had actual knowledge of the Warrantors' breaches of their R&Ws, the Master Servicers' and Servicers' breaches, and Events of Default, as alleged above.

161.    Notwithstanding that knowledge, BNY Mellon failed to perform its duties under and therefore breached the Governing Agreements.

162.    BNY Mellon's breach of its duties under the Governing Agreements deprived the Subject Trusts and Triaxx of the consideration they bargained for, *e.g.*, they did not receive RMBS that were collateralized by Mortgage Loans which were warranted to be of a certain credit quality, and breaches of these R&Ws were not enforced as required by the Governing Agreements.

163.    These breaches of the Governing Agreements by BNY Mellon directly and proximately caused Triaxx to suffer damages, among other things, in the form of losses to the value of the certificates.

164.    BNY Mellon has engaged in continuing breaches of the Governing Agreements by failing to fulfill its duties.

165.    As a result of BNY Mellon's breaches of contract, judgment should be entered in favor of Triaxx and against BNY Mellon in an amount to be proven at trial but not less than $58.2 million.

### THIRD CLAIM FOR RELIEF
**(Negligence/Failure to Avoid Conflicts against U.S. Bank)**

166.    Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

167.    Under New York law, U.S. Bank, as an indenture Trustee, has specific extra-contractual duties to the Subject Trusts and all Certificateholders.  These

duties include the duty to give the Subject Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest.  Trustees like U.S. Bank must discharge their obligations with absolute singleness of purpose.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the Governing Agreements that purport to define and limit the duties of the trustee.

168.    As alleged in detail above, U.S. Bank knew of Warrantors' breaches of R&W's and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers; however, U.S. Bank was economically beholden to the sellers.

169.    In addition, U.S. Bank was itself a servicer and master servicer to other mortgage loans and RMBS trusts and was engaged in the same wrongful conduct.

170.    U.S. Bank derived significant business through its relationships with Sponsors, Servicers, and Master Servicers, and did not want to disrupt these relationships by enforcing R&W claims or declaring events of default.  Consequently, U.S. Bank advanced its own interests at the expense of the Subject Trusts and Certificate holders.

171.    In addition, U.S. Bank faced liability for its own servicing violations as well as repurchase liability for the sale and securitization of its own loans in breach of its specific representations and warranties.  To protect its own rather than the Certificateholders' interests, U.S. Bank failed in its capacity as Trustee for the Subject Trusts to take any action against the Warrantors, servicers and master servicers, or even notify the Certificateholders of seller or servicer/master servicer defaults.

172.   U.S. Bank's negligence in failing to avoid conflicts of interest has directly and proximately caused damages to the Trusts.

173.   As a result of U.S. Bank's fnegligence, judgment should be entered in favor of Triaxx and against U.S. Bank in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
**(Negligence/Failure to Avoid Conflicts against BNY Mellon)**

174.   Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

175.   Under New York law, BNY Mellon, as an indenture Trustee, has specific extra-contractual duties to the Trusts and all Certificateholders.  These duties include the duty to give the Subject Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest.  Trustees like BNY Mellon must discharge their obligations with absolute singleness of purpose.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the Governing Agreements that purport to define and limit the duties of the trustee.

176.   As alleged in detail above, BNY Mellon knew of Warrantors' breaches of R&W's and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers; however, BNY Mellon was economically beholden to the sellers.

177.   BNY Mellon derived significant business through its relationships with Sponsors, Servicers, and Master Servicers, and did not want to disrupt these relationships by enforcing R&W claims or declaring events of default.  Consequently, BNY Mellon advanced its own interests at the expense of the Subject Trusts and Certificate holders.

178.    BNY Mellon's negligence in failing to avoid conflicts of interest has directly and proximately caused damages to the Trusts.

179.    As a result of BNY Mellon's negligence, judgment should be entered in favor of Triaxx and against BNY Mellon in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty against U.S. Bank)

180.    Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

181.    After the occurrence of an Event of Default, U.S. Bank's duties expanded to include a fiduciary duty owed to the Subject Trusts and all Certificateholders.  This fiduciary duty included the obligation to exercise its rights and powers in good faith and to bring all available claims for the benefit of the Subject Trusts and the Certificateholders following an Event of Default.

182.    U.S. Bank breached its fiduciary duty to the Subject Trusts and all Certificateholders in several respects, including, but not limited to, by failing to: (i) preserve records of the Trustees and demanding that that Warrantors, servicers/master servicers and custodians do the same; (ii) hire financial and legal advisers to determine the scope and severity of R&W breaches and servicing failures among the trusts they administer; (iii) identify potential adverse parties and estimate their solvency; (iv) develop viable legal theories of recovery and understand applicable statutes of limitation; (v) based on the above, create a strategy for recovery across all of the Subject Trusts; and (vi) execute that strategy in order to protect the Subject Trusts and Certificateholders.[12]

---

[12] In the First Amended Complaint, Triaxx brought a fiduciary duty claim against Defendants based on their failure to abide by their contractual duties as set forth in the PSAs.  As the Court recognized in the 3/21/17 Order, Triaxx did not pursue this claim, as pleaded, in the proposed Second Amended Complaint.

183.    U.S. Bank's breaches of its fiduciary duty have directly and proximately caused damages to the Subject Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered but for U.S. Bank's breaches of its fiduciary duty.

184.    U.S. Bank's breaches of its fiduciary duty have injured Triaxx, in that they have caused Triaxx losses, have diminished the value of the certificates held by Triaxx, and have prevented the Subject Trusts' Certificateholders from protecting the rights of the trusts.

185.    As a result of U.S. Bank's breaches of fiduciary duty, judgment should be entered in favor of Triaxx and against U.S. Bank in an amount to be proven at trial..

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty against BNY Mellon)

186.    Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

187.    After the occurrence of an Event of Default, BNY Mellon's duties expanded to include a fiduciary duty owed to the Subject Trusts and all Certificateholders.  This fiduciary duty included the obligation to exercise its rights and powers in good faith and to bring all available claims for the benefit of the Subject Trusts and the Certificateholders following an Event of Default.

---

To be clear, the fiduciary duty claims asserted herein (the Fifth and Sixth Claims) are based on *extra-contractual* fiduciary duties – not the contractually-based obligations alleged in the fiduciary duty claims asserted in the First Amended Complaint.

188.    BNY Mellon breached its fiduciary duty to the Subject Trusts and all Certificateholders in several respects, including, but not limited to, by failing to: (i) preserve records of the Trustees and demanding that that Warrantors, servicers/master servicers and custodians do the same; (ii) hire financial and legal advisers to determine the scope and severity of R&W breaches and servicing failures among the trusts they administer; (iii) identify potential adverse parties and estimate their solvency; (iv) develop viable legal theories of recovery and understand applicable statutes of limitation; (v) based on the above, create a strategy for recovery across all of the Subject Trusts; and (vi) execute that strategy in order to protect the Subject Trusts and Certificateholders.

189.    BNY Mellon's breaches of its fiduciary duty have directly and proximately caused damages to the Subject Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered but for BNY Mellon's breaches of its fiduciary duty.

190.    BNY Mellon's breaches of its fiduciary duty have injured Triaxx, in that they have caused Triaxx losses, have diminished the value of the certificates held by Triaxx, and have prevented the Subject Trusts' Certificateholders from protecting the rights of the trusts.

191.    As a result of BNY Mellon's breaches of fiduciary duty, judgment should be entered in favor of Triaxx and against U.S. Bank in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Duty and Equitable Relief against U. S. Bank)

192.    Triaxx repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

193.    Section 7.5 of the Indentures requires the "Issuer (or the Trustee on behalf of the Issuer) … to take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to … (iv) enforce any of the Pledged Securities [which include the RMBS at issue in this action] or other instruments or property included in the Collateral."  The claims asserted in this action are rights and remedies of the Triaxx CDOs with respect to the Pledged Securities and assets of the Triaxx CDOs constituting part of the Collateral, as defined in the Indentures.  The Triaxx CDOs, as Issuers, have attempted to pursue those claims in accordance with Section 7.5 and have been unable to do so in this Action without the cooperation of U.S. Bank as the CDO Trustee.  Accordingly, it is incumbent on U.S. Bank as the CDO Trustee to pursue or facilitate the pursuit of such claims.

194.    Absent an assignment of the right to pursue such claims to the Triaxx CDO, or to the Collateral Manager, U.S. Bank is operating under an irreconcilable conflict of interest, which it has a legal obligation to avoid.  U.S. Bank, in its capacity as the CDO Trustee, is forfeiting, in its own self-interest, valuable property rights in the RMBS collateral belonging to the Triaxx CDOs and their Noteholders.

195.    By letter dated April 18, 2017 (Exhibit C), the Collateral Manager, as the Triaxx CDOs' attorney-in-fact, pursuant to § 2(d) of the Collateral Management Agreements, directed U.S. Bank, as trustee, to assign its authority to the Triaxx CDOs or to the Collateral Manager, and appoint the Collateral Manager as its designee, to pursue the Triaxx Action on its behalf.  To the extent U.S. Bank as the CDO Trustee fails to do so, such failure is a breach of the CDO Trustees' explicit duties under the Indentures, and in particular Section 7.5 thereof.

... 

196.   To date, U.S. Bank has not indicated that it will take the steps requested by the Collateral Manager in its April 18, 2017 letter, and based on U.S. Bank's conduct in this matter to date the Triaxx CDOs have a reasonable concern that U.S. Bank will decline to take those steps.

197.   Because U.S. Bank has an irreconcilable conflict of interest, U.S. Bank's failure to step aside and let the Collateral Manager pursue the claims alleged herein is a breach of duty that has directly and proximately caused damages to the Subject Trusts.

198.   Based on U.S. Bank's arguments as to Triaxx's alleged lack of standing, Triaxx has no adequate remedy at law.

199.   Accordingly, the Court should exercise its equitable power over U.S. Bank as a trustee to direct U.S. Bank to comply with the Collateral Manager's April 18, 2017 letter of direction, and direct U.S. Bank, as trustee, to assign its authority to the Triaxx CDOs or to the Collateral Manager, and appoint the Collateral Manager as its designee, to pursue the Triaxx Action on its behalf.

**WHEREFORE**, Triaxx demands judgment in its favor and against U.S. Bank and BNY Mellon as follows:

(i)    On its First Claim for Relief, awarding Triaxx a money judgment against U.S. Bank in an amount not less than $222.2 million, plus interest at the New York statutory rate of 9% per year from the applicable dates of breach to date of judgment;

(ii)   On its Second Claim for Relief, awarding Triaxx a money judgment against BNY Mellon in an amount not less than

$58.2 million, plus interest at the New York statutory rate of 9% per year from the applicable dates of breach to date of judgment;

(iii)   On its Third Claim for Relief, awarding Triaxx a money judgment against U.S. Bank in an amount to be determined at trial, plus interest at the New York statutory rate of 9% per year from the applicable dates of negligence to date of judgment, and declaratory judgment that U.S. Bank has operated and continues to operate in a conflict of interest with the Certificateholders in the Subject Trusts;

(iv)   On its Fourth Claim for Relief, awarding Triaxx a money judgment against BNY Mellon in an amount to be determined at trial, plus interest at the New York statutory rate of 9% per year from the applicable dates of negligence to date of judgment, and declaratory judgment that BNY Mellon has operated and continues to operate in a conflict of interest with the Certificateholders in the Subject Trusts;

(v)   On its Fifth Claim for Relief, awarding Triaxx a money judgment against U.S. Bank in an amount to be determined at trial, plus interest at the New York statutory rate of 9% per year from the applicable dates of breach of fiduciary duty to date of judgment.

(vi)   On its Sixth Claim for Relief, awarding Triaxx a money judgment against BNY Mellon in an amount to be determined at trial, plus

interest at the New York statutory rate of 9% per year from the

applicable dates of breach of fiduciary duty to date of judgment.

(vii)     On its Seventh Claim for Relief, an order directing U.S. Bank to

assign to the Triaxx CDOs or to the Collateral Manager its

authority to pursue the Triaxx Action; and

(viii)    Granting such other or further relief as the Court may deem just

and proper in the circumstances.

Dated:  July 24, 2017

                                             MILLER & WRUBEL P.C.

                              By: _____
                                             John G. Moon
                                             Charles R. Jacob III
                                             Nicholas Cutaia
                                             Kerrin T. Klein
                                             570 Lexington Avenue
                                             New York, New York 10022
                                             212-336-3500

                                             *Attorneys for Plaintiffs*

**DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a trial by jury on

all issues so triable.

Dated: July 24, 2017

MILLER & WRUBEL P.C.

By: _____
John G. Moon
Charles R. Jacob III
Nicholas Cutaia
Kerrin T. Klein
570 Lexington Avenue
New York, New York 10022
212-336-3500

*Attorneys for Plaintiffs*