UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRIAXX PRIME CDO 2006-1, LTD., <br> TRIAXX PRIME CDO 2006-2, LTD., <br> TRIAXX PRIME CDO 2007-1, LTD., <br><br> Plaintiffs, <br><br> -against- <br><br> THE BANK OF NEW YORK MELLON, and <br> U.S. BANK NATIONAL ASSOCIATION, <br><br> Defendants. | Case No. 16-CV-01597 (NRB) <br><br> Hon. Naomi Reice Buchwald |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
JOINT MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500
*Attorneys for Plaintiffs*

Dated: New York, New York
August 28, 2017

## TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................. 1

Statement of Facts ....................................................................................................... 4

Argument ..................................................................................................................... 5

I.  TRIAXX HAS STANDING TO ASSERT
    ITS CONTRACT CLAIMS IN THIS ACTION ................................................... 5

    A.  *Natixis* Is Controlling New York Law and Makes Clear that the Trustee's
        Authority to Sue Is Non-Exclusive .......................................................... 5

    B.  Under New York Law, the Indenture and Collateral Management Agreement
        Must Be Read Together as They Are Parts of a Single Transaction .................. 10

    C.  Section 7.5 of the Indenture Concerns "Protection of Collateral,"
        Not Just Preservation of a Security Interest ........................................... 11

    D.  Direction from the Noteholders Is Not Needed
        for the Triaxx CDOs to Maintain this Action ........................................... 12

II.  TRIAXX HAS STANDING TO PURSUE ITS TORT CLAIMS ................................. 14

    A.  Triaxx Suffered a Cognizable Injury ....................................................... 14

        1.  Triaxx Has Standing Under Article III ........................................... 15

        2.  Triaxx Has Adequately Alleged Damages ......................................... 17

    B.  Triaxx Did Not Assign the Tort Claims ..................................................... 19

III.  THE ECONOMIC LOSS DOCTRINE
     DOES NOT BAR TRIAXX'S TORT CLAIMS ................................................. 21

IV.  TRIAXX HAS STATED CLAIMS FOR BREACH
    OF EXTRA-CONTRACTUAL FIDUCIARY DUTIES ................................... 23

V.  TRIAXX'S SEVENTH CAUSE OF ACTION
    STATES A VALID CLAIM FOR RELIEF .................................................. 23

Conclusion ................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*,
509 F. App'x 82 (2d Cir. 2013) ....................................................... 20

*Amara v. Cigna Corp.*,
925 F. Supp. 2d 242 (D. Conn. 2012), *aff'd*, 775 F.3d 510 (2d Cir. 2014) ........................... 24

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003).......................................................... 15

*Benedict v. Amaducci*,
1993 U.S. Dist. LEXIS 3556 (S.D.N.Y. 1993)................................... 24

*Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank*,
2017 U.S. Dist. LEXIS 48609 (S.D.N.Y. Mar. 30, 2017) ................................ 22, 23

*Commander Oil Corp. v. Advance Food Serv. Equip.*,
991 F.2d 49 (2d Cir. 1993)........................................................... 10

*Commonwealth of Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*,
25 N.Y.3d 543 (N.Y. 2015) .......................................................... 19

*Cruden v. Bank of New York*,
957 F.2d 961 (2d Cir. 1992).......................................................... 13

*CWCapital Asset Management, LLC v. Chicago Properties LLC*,
610 F.3d 497 (7th Cir. 2010) ..................................................... 2, 8, 11

*Dexia SA/NV v. Morgan Stanley,*
41 Misc. 3d 1214(A) (N.Y. Sup. Ct. Oct. 16, 2013)....................................... 18, 19

*Dexia SA/NV v. Morgan Stanley*,
135 A.D.3d 497 (N.Y. App. Div. 1st Dep't 2016)........................................ 19, 20

*FDIC v. Citibank N.A.,*
2016 U.S. Dist. LEXIS 186200 (S.D.N.Y. Sept. 30, 2016)................................... 18

*FMS Bonds, Inc. v. Bank of N.Y. Mellon*,
2016 U.S. Dist. LEXIS 98856 (S.D.N.Y. July 28, 2016) ..................................... 22

*Hildene Capital Management, LLC v. Bank of New York Mellon*,
105 A.D.3d 436 (N.Y. App. Div. 1st Dep't 2013).......................................... passim

*House of Europe v. Wells Fargo Bank, N.A.*,
    2014 U.S. Dist. LEXIS 49894 (S.D.N.Y. Mar. 31, 2014) ................................................ 17, 18

*Hydro Investors, Inc. v. Trafalgar Power, Inc.*,
    227 F.3d 8 (2d Cir. 2000) .................................................................................................. 22

*In re A.H. Robins Co.*,
    880 F.2d 769 (4th Cir. 1989) ............................................................................................ 24

*In re Joint E. & S. Dist. Asbestos Litig.*,
    1991 U.S. Dist. LEXIS 7527 (E.D.N.Y. May 16, 1991) .................................................... 24

*Int'l Design Concepts, LLC v. Saks Inc.*,
    486 F. Supp. 2d 229 (S.D.N.Y. 2007) ................................................................................ 20

*Natixis Real Estate Capital Trust 2007-HE2 v. Natixis Real Estate Holdings, LLC*,
    50 N.Y.S.3d 13 (N.Y. App. Div. 1st Dep't 2017) ......................................................... passim

*Nau v. Vulcan Rail & Constr. Co.*,
    286 N.Y. 188 (N.Y. 1941) ................................................................................................. 10

*Petrohawk Energy Corp. v. Law Debenture Trust Co.*,
    2007 U.S. Dist. LEXIS 5803 (S.D.N.Y. Jan. 29, 2007) .................................................... 15

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*,
    2016 U.S. Dist. LEXIS 41119 (S.D.N.Y. Mar. 28, 2016) .................................................. 21

*Phoenix Light*,
    172 F. Supp. 3d 700 (S.D.N.Y. 2016) ............................................................................... 22

*Pro Bono Inv., Inc. v. Gerry, No.*,
    2008 U.S. Dist. LEXIS 87450 (S.D.N.Y. Oct. 29, 2008) .................................................. 20

*Royal Park Invs. SA/NV v. Morgan Stanley et al.*,
    2017 N.Y. Misc. LEXIS 1374 (N.Y. Sup. Ct. Apr. 12, 2017)........................................... 20

*Royal Park*,
    109 F. Supp. 3d at 609 (S.D.N.Y. 2015)........................................................................... 22

*TekVet Techs., Co. v. CrystalTech Web Hosting, Inc.*,
    2016 U.S. Dist. LEXIS 55064 (S.D.N.Y. Apr. 25, 2016)................................................... 22

*This Is Me v. Taylor*,
    157 F.3d 139 (2d Cir. 1998)............................................................................................... 10

*U.S. v. Cambio Exacto, S.A.*,
    166 F.3d 522 (2d Cir. 1999)............................................................................................... 16

Plaintiffs Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd. and Triaxx Prime CDO 2007-1, Ltd. (collectively, "Triaxx" or the "Triaxx CDOs") submit this Memorandum of Law in Opposition to Defendants' July 14, 2017 Joint Motion to Dismiss Plaintiffs' Third Amended Complaint (the "TAC").

## Preliminary Statement

This action involves Defendants' continued efforts to advance their own self-interest over the interests of the noteholders of the Triaxx CDOs.  Any trustee acting in good faith and subject to the indisputable conflict of interest affecting U.S. Bank N.A. ("U.S. Bank") here would have long ago stepped aside and permitted the Collateral Manager to pursue Triaxx's claims against U.S. Bank and The Bank of New York Mellon ("BNYM").  Defendants, in contrast (in particular U.S. Bank), have determined to act for their benefit and continue to assert a variety of procedural and substantive arguments for the sole purpose of avoiding their own liability.

Notably, Defendants no longer contest the sufficiency of Triaxx's claims alleging that Defendants breached their contractual duties as Trustees (the "Contract Claims") (*see* TAC, First and Second Claims for Relief).  Rather, Defendants seek to escape liability for those contractual breaches based only on the contention that Triaxx lacks standing.  As set forth below, Defendants are wrong.

Since the standing issue was last briefed and argued to the Court, the New York Appellate Division, First Department clarified New York law as to standing and did so in Triaxx's favor.  In *Natixis Real Estate Capital Trust 2007-HE2 v. Natixis Real Estate Holdings, LLC*, 50 N.Y.S.3d 13 (N.Y. App. Div. 1st Dep't 2017), the Appellate Division adopted the reasoning by Judge Posner in *CWCapital Asset Management, LLC v. Chicago Properties LLC*,

610 F.3d 497 (7th Cir. 2010), which held that the "trust holds legal title" to the trust collateral "but delegates equitable ownership" to the administrator that actually "administers the trust" – here, the Collateral Manager.[1]  *Natixis*, 50 N.Y.S. 3d at 17.  Thus, in *Natixis* the administrator (there called the "Securities Administrator," having a role comparable to that of the Collateral Manager here) was deemed to have standing to bring suit in the name of the CDO in question, even though the granting clause assigned legal title to the trustee.  Here, the CMA grants the Collateral Manager such authority and must be read together with the Indenture as a single agreement.  *See infra*, Points I(A) and I(B).

Although *Natixis* by itself is sufficient to establish Triaxx's standing, § 7.5 of the Indenture reinforces this conclusion.  Section 7.5 states clearly that the Issuer (*i.e.*, the Triaxx CDOs) shares enforcement responsibility with the Trustee (*i.e.*, U.S. Bank), as the court in *Natixis* recognized.  On April 18, 2017, the Collateral Manager, as the Triaxx CDOs' attorney-in-fact, directed Defendant U.S. Bank, as CDO Trustee, to assign its co-authority to enforce the Contract Claims (and others) to the Triaxx CDOs or the Collateral Manager.  This direction was completely consistent with *Natixis*, the express terms of § 7.5 of the Indenture, and § 5.13 of the Indenture, which exempts the Trustee (*i.e.*, U.S. Bank) from having to "take any action that it determines might involve it in liability."  Declaration of Nicholas Calamari, dated August 28, 2017 ("Calamari Decl."), Exs. 4-6.  *See infra*, Point I(C).

Predictably, U.S. Bank refused to comply with this directive (authorized under the Indenture), notwithstanding U.S. Bank's obvious and disqualifying conflict of interest.  Thus, in

---

[1]  "Collateral Manager" refers to Triaxx Asset Management LLC, the Collateral Manager of the Triaxx CDOs under the Indentures and Collateral Management Agreements ("CMAs").  Calamari Decl. ¶ 1.  Because the three Indentures and CMAs are identical in all respects relevant here, they are hereafter referred to in the singular.

addition to having standing under *Natixis*, the Triaxx CDOs are entitled to equitable relief against U.S. Bank.  *See infra*, Point V.

Defendants also argue that Triaxx cannot assert tort claims against them (the "Tort Claims") (*see* TAC, Third through Sixth Claims for Relief).  This is incorrect as well.

**First**, Defendants are wrong that the Triaxx CDOs did not suffer an injury sufficient to establish standing and do not plausibly allege injury sufficient to pursue the Tort Claims.  Under Article III of the U.S. Constitution and New York law, issuers such as RMBS trusts and CDOs have standing and allege an injury-in-fact for a tort claim even though the damages recovered ultimately flow to the underlying noteholders.  *See infra,* Point II(A).

**Second**, Defendants' claim that Triaxx assigned the Tort Claims contradicts well-established New York law.  Absent an express assignment, tort claims are not assigned.  In any event, that rule is inapplicable in the RMBS/CDO context.  *See infra,* Point II(B).

**Third**, the economic loss doctrine does not apply to the Tort Claims.  The economic loss doctrine applies only to tort claims based on the breach of contractual duties.  Here, the TAC pleads that Defendants breached several extra-contractual duties.  TAC ¶¶ 166-191.  *See infra,* Point III.

**Finally**, Defendants incorrectly claim that Triaxx abandoned the fiduciary duty claims alleged in the TAC.  The only claims the Court found abandoned by Triaxx were those alleged in the First Amended Complaint, which asserted fiduciary duty claims based on Defendants' failure to abide by the contractual duties in the PSAs.  The fiduciary duty claims in the TAC are expressly based on post-Event-of-Default ("EOD") extra-contractual duties.  *See infra,* Point IV.

### Statement of Facts[2]

Triaxx sues Defendants for (i) breach of their contractual duties as Trustees (First and Second Causes of Action), (ii) negligence and failure to avoid conflicts of interest (Third and Fourth Causes of Action), (iii) breach of their extra-contractual fiduciary duties to exercise their rights and powers in good faith and to bring all available claims for the benefit of the Subject Trusts and the Certificateholders (Fifth and Sixth Causes of Action), and (iv) as to U.S. Bank only, for breach of duty and equitable relief directing U.S. Bank to comply with the Collateral Manager's April 18, 2017 letter of direction (Seventh Cause of Action).

As noted, Defendants do not challenge the legal sufficiency of the Contract Claims.  Defendants' objection to those claims depends solely on their arguments as to lack of standing.  The 3/21/17 Order provisionally sustained Defendants' challenge to Triaxx's standing on the law and the record as presented on Defendants' previous motion to dismiss.  The law and the record before the Court now are different; and, as discussed in Point I below, Triaxx's standing to assert the Contract Claims in this action should be upheld.  Likewise, this Court should reject Defendants' arguments for dismissal of the Tort Claims and Triaxx's claims for breach of fiduciary duty and equitable relief.

---

[2] We assume the Court's familiarity with the nature of this action and the structure of RMBS securitizations based on the parties' previous submissions and the Court's March 21, 2017 Memorandum and Order ("3/21/17 Order").

## Argument

## I.

## TRIAXX HAS STANDING TO ASSERT ITS CONTRACT CLAIMS IN THIS ACTION

**A.**   *Natixis* **Is Controlling New York Law and Makes Clear that the Trustee's Authority to Sue Is Non-Exclusive**

After Defendants' previous motion to dismiss was fully briefed and argued, the New York Appellate Division clarified New York law as to standing, in Triaxx's favor, in *Natixis*, 50 N.Y.S.3d 13.  As the Indenture and CMA are governed by New York law,[3] *Natixis* is controlling here.

In *Natixis*, the Appellate Division held that, notwithstanding a broad "granting" clause in the applicable Pooling and Servicing Agreement ("PSA") (the equivalent of the Indenture and CMA here), the right to pursue certain RMBS-related claims was *not* "within the exclusive domain of a[n] RMBS's trustee so as to deny [the administrative entity] standing" to bring suit.  *Id.* at 15.

The court *rejected* the "argument that only a trustee of an express trust has the authority to commence an action in a RMBS trust."  *Id.* at 17.  On the contrary, the court held that, although a "trust holds legal title to the [trust collateral], . . . *[it] delegates equitable ownership to*" the entity responsible for the trust's administration, which also has standing to bring suit.  *Id.* (emphasis added).  That principle clearly applies here.

In *Natixis*, the plaintiff CDO sued under the direction of the CDO's Securities Administrator, a position comparable to that of the Collateral Manager here.  *Id.* at 16.  The CDO

---

[3] Calamari Decl., Exs. 4-6 (Indenture, § 14.10); Exs. 1-3 (CMA, § 23).

asserted claims for breaches of representations and warranties by Natixis, the sponsor of the transaction, referred to as "SA Warranties." *Id*. There, as here, in the PSA's "granting" clause the CDO had granted and assigned "all right, title and interest" in the "Trust Fund" (as defined) to the trustee. Jacob Decl., Ex. 1 at p. 66 (definition of "Trust Fund" at (iv) and (v)) and § 2.01). The Trust Fund was expressly defined to include the CDO's rights with respect to the SA Warranties. *Id*. at p. 66. So, there as here, although the trustee held legal title to the assigned property, the CDO and its functions, including litigation, continued to be administered by an administrative entity other than the trustee.

The *Natixi*s defendant moved to dismiss on the ground that only the trustee had standing to sue or cause the CDO to sue. The trial court rejected this argument, and the Appellate Division affirmed, stating:

> We disagree . . . with Natixis' argument that only a trustee of an express trust has the authority to commence an action in an RMBS trust.
>
> Natixis' argument is based on a misunderstanding of the role of the securities administrator of an RMBS trust. A trust holds legal title to the mortgage, but *delegates equitable ownership* to the special servicer, the securities administrator, who administers the trust pursuant to a pooling and servicing agreement (PSA). …
>
> Here, under the plain language of the PSA, the Securities Administrator has broad authority …, including the right to prosecute legal action. Specifically, section 10.02(viii) of the PSA provides in pertinent part:
>
>> … [T]he Securities Administrator may in its discretion undertake any such action that it may deem necessary or desirable in respect of this Agreement and the rights and duties of the parties hereto and the interests of the Trustee, the Securities Administrator and the Certificate holders hereunder.

50 N.Y.S.3d at 17-18 (emphasis added and citations omitted).

6

Here, the relevant language in the CMA is functionally indistinguishable from the PSA language in *Natixi*s.  As is clear from the Indenture, and not in dispute, U.S. Bank as trustee has no role in the day-to-day management of the Triaxx CDOs.  That is the role of the Collateral Manager.  Calamari Decl. ¶ 3.  The power to act with respect to the Triaxx CDOs' collateral, including claims involving the Subject Trusts, is expressly conveyed to the Collateral Manager.  The Collateral Manager:

> shall … *take on behalf of the Issuer or direct the Trustee to take* [various enumerated] actions with respect to a Collateral Debt Security, an Equity Security or an Eligible Investment:  … [including] *exercis[ing] any other rights or remedies* with respect to such Collateral Debt Security, Equity Security or Eligible Investment as provided in the related Underlying Instruments or *tak[ing] any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders*.  CMA (Calamari Decl. Exs. 1-3), § 2(d) (emphasis added.)

In furtherance of the foregoing, the Triaxx CDOs appointed the Collateral Manager:

> the Issuer's true and lawful agent and attorney-in-fact, *with full power of substitution and full authority in the Issuer's name, place and stead* and without any necessary further approval of the Issuer, in connection with the performance of the Collateral Manager's duties provided for in this Agreement, including the … powers … [to] take any other action specified in Section 2(d).  CMA (Calamari Decl. Exs. 1-3), § 2(p) (emphasis added).

That the CMA is subject to the terms of the Indenture changes nothing (indeed, they must be read together; *see* Point I.B *infra*).  Section 7.5 of the *Indenture* states clearly that the Issuer shares enforcement responsibility, requiring the "*Issuer (or the Trustee* on behalf of the Issuer), [to] . . . take such other action as may be necessary or advisable or desirable to . . . (iv) enforce any of the Pledged Securities or other instruments or property included in the Collateral."  Calamari Decl., Exs. 4-6 (emphasis added).  It is in exactly this type of circumstance, where the Trustee refuses to enforce the obligations it holds for the benefit of

those Secured Parties due to a blatant conflict of interest, that it is "necessary" and "advisable"

for the *Issuer* to take action to enforce the Pledged Securities for the benefit of the Noteholders.

In *Natixis*, the Appellate Division followed Judge Posner's decision in *CWCapital Asset Management, LLC v. Chicago Properties LLC*, 610 F.3d 497 (7th Cir. 2010). The Seventh Circuit found that, although "[t]he trust holds the legal title to the [collateral in the trust]," the PSA (comparable to the Indenture and CMA here, but in a single document), "*delegates what is effectively equitable ownership of the claim* (albeit for eventual distribution of proceeds to the owners of the tranches of the [security] in accordance with their priorities) to the servicer." *Id.* at 500-501 (emphasis added). Thus, the conveyance of legal title to the trustee does not negate the standing created by the equitable interest of the entities charged with enforcing rights of the CDO, as the Collateral Manager is here.[4]

*Natixis* also cites *Hildene Capital Management, LLC v. Bank of New York Mellon*, 105 A.D.3d 436 (N.Y. App. Div. 1st Dep't 2013), another case that is controlling here. *Hildene* involved the same procedural posture as here, namely, a CDO issuer suing a trustee for the trustee's breaches of the indenture. In *Hildene*, as here, there was a broad grant to the trustee in the indenture of all rights to the collateral in the trust. Jacob Decl. Ex. 2 at 1-2. Nonetheless, the court found that the issuer, referred to as "PreTSL XX," "ha[d] standing to bring a breach of contract claim" against defendant trustee. 105 A.D.3d at 438. That standing arose from exactly

---

[4] Judge Posner also found standing conveyed by the fact that the servicer in *CWCapital* received compensation for its services relating to the trust. 610 F.3d at 501. Similarly, here the Collateral Manager not only receives compensation for its services relating to the trust (*see, e.g.*, Calamari Decl. Exs. 1-3 at § 8), but is both an express third-party beneficiary of the Indenture (*id.*, Exs. 4-6 (Indenture, § 14.9)) and a "Secured Party" beneficiary of the granting clause itself (*id.*, definition of "Secured Party" in Preliminary Statement, and granting clause, at 1).

the same type of duties as the Issuer/Collateral Manager have here under § 7.5 of the Indenture

and the applicable provisions of the CMA:

> Most significantly, PreTSL XX has standing based upon the contractual duties it assumed under the indenture [citation omitted]. In the "Granting Clause," PreTSL XX granted its "right, title and interest" in the collateral securities to BNYM, "for the benefit of itself and the Holders of the Notes," and "in trust . . . to secure compliance with the provisions of this indenture . . . Section 3.5 of the indenture, "Protection of the Trust Estate," authorizes PreTSL XX to take action "necessary or advisable to: … (iv) preserve and defend title to the collateral."  *Defendants' interpretation of the granting clause would lead to the perverse result that a grant made expressly to secure compliance with the indenture and to benefit PreTSL XX and the noteholders would preclude PreTSL XX from bringing claims, for the benefit of itself and the noteholders, to recover damages for BNYM's alleged breach of the indenture.*

*Id*. (emphasis added; ellipses in part by the Court).

Here, using similar language, § 7.5(a)(iv) of the Indenture requires the "*Issuer (or*

*the Trustee* on behalf of the Issuer), [to] . . . take such other action as may be necessary or

advisable or desirable to . . . (iv) enforce any of the Pledged Securities or other instruments or

property included in the Collateral."  Calamari Decl., Exs. 4-6.  *There is no ambiguity in the*

*word "or"*; notwithstanding the "granting" clause, the Issuer (the Triaxx CDOs) has co-equal

authority to bring suit in these circumstances.

The CMA confirms this in multiple places.  Sections 2(d) and (p) of the CMA,

above, provide authority to the Collateral Manager to cause the Triaxx CDOs to pursue litigation

"in the Issuer's name," that is, in the names of the Triaxx CDOs.  *Id.*, Exs. 1-3.  Further, § 10(b)

of the CMA provides for the Collateral Manager to be indemnified "for all reasonable fees and

expenses  . . . incurred in investigating, preparing [or] *pursuing any claim, action [or]*

*proceeding*" relating to the Triaxx CDOs (emphasis added).  *Id.*  Thus, the CMA specifically

contemplates the Collateral Manager "pursuing" litigation in the name of the Triaxx CDOs.  If

the Issuer lacked standing to sue under the direction of the Collateral Manager, there would be

no purpose in those provisions being in the CMA at all.  They are there because the Issuer *does*

have standing, as *Natixis* has made clear.

**B.     Under New York Law, the Indenture and Collateral Management Agreement
        Must Be Read Together as They Are Parts of a Single Transaction**

Defendants treat the Indenture and the CMA as though they have nothing to do

with each other.  This is erroneous under settled New York law requiring that these

contemporaneous, cross-referenced agreements be read together as they are part of a single

transaction.  Each Indenture and each CMA for each of the Triaxx CDOs is contemporaneous

with the other and the cross-references within each are extensive.  Calamari Decl. ¶¶ 2-4.[5]  It is

therefore beyond debate that the Indenture and the CMA must be read together to determine the

parties' intent.  *See This Is Me v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York

law, all writings forming part of a single transaction are to be read together."); *Commander Oil

Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993) ("Generally, separate

writings are construed as one agreement if they relate to the same subject matter and are

executed simultaneously."); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (N.Y. 1941)

("All three instruments were executed at substantially the same time, related to the same subject-

matter, were contemporaneous writings and must be read together as one.").

---

[5] *See, e.g.*, Indenture, Calamari Decl., Exs. 4-6, at 1 ("The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under . . . the Collateral Management Agreement"), 11 (defining "Collateral Manager" "pursuant to the applicable provisions of the Collateral Management Agreement"); CMA, Calamari Decl., Exs. 1-3, at 1 ("WHEREAS, the Indenture authorized the Issuer to enter into this Agreement, pursuant to which the Collateral Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral securing the Senior Notes in the manner and on the terms set forth herein and in the Indenture and to provide such additional duties as are consistent with the terms of this Agreement and the Indenture as the Issuer may from time to time reasonably request").

The Indenture and CMA read together cover the same general topics as did the PSA in *Natixis* (Jacob Decl., Ex. 1), and the Indenture in *Hildene* (*id.,* Ex. 2) – establishment and administration of the trust.  The fact that there was a single agreement covering these subjects in those cases, and two contemporaneous, cross-referenced agreements in this case, is immaterial.

Because the Indenture by itself, and certainly the Indenture and CMA read together, give the Issuer standing to bring litigation under the direction of the Collateral Manager, Defendants' *sole ground* for distinguishing *Natixis* – that "neither the CDO Indenture nor the CMA provides independent authority to the Issuer or the Collateral Manager to bring these claims" (Defs. Br. at 6) – is wrong.  *Natixis* is squarely on point here.

**C.     Section 7.5 of the Indenture Concerns "Protection of Collateral,"
        <u>Not Just Preservation of a Security Interest</u>**

As noted, § 7.5(a)(iv) of the Indenture expressly authorizes "the Issuer," that is, the plaintiff Triaxx CDOs, "*or"* the Trustee (consistent with the standing analysis in *Natixi*s) to "take such other action as may be necessary or advisable or desirable to . . . enforce any of the Pledged Securities or other instruments or property included in the Collateral."  Defendants concede, as they must, that this "includ[es] the RMBS certificates" held by Triaxx and at issue in this action.  (Defs. Br. at 4.)[6]

In response, Defendants argue that § 7.5 of the Indenture is concerned solely with "preservation of a security interest in the Collateral," not enforcement of the Collateral or any other matters.  *Id*.  The problem with this argument is that it is directly contradicted in multiple places by the plain language of § 7.5 itself.  Indeed:

---

[6] The RMBS held by the Triaxx CDOs fall within the definitions of both "Pledged Securities" and "Collateral" in the Indenture.  *See* Indenture, definitions of "Pledged Securities" and "Collateral Debt Security," and definition of "Collateral" in the granting clause at p. 1.

- Section 7.5 is entitled "Protection of Collateral," not "preservation of security interest" or the like (Calamari Decl., Exs. 4-6);

- Section 7.5(a)(iv) specifically refers to the Issuer's authority to "take such other action as may be necessary or advisable or desirable to . . . *enforce* any … instruments or property included in the Collateral." *Id.* (emphasis added). No mention is made of a security interest and the term "enforce" is certainly a broad enough term to include enforcing the rights associated with the RMBS that are included in the Collateral; and

- Section 7.5(d) is another enforcement provision for the Issuer that makes no reference to a security interest, and provides that "[t]he Issuer shall enforce all of its material rights and remedies" under hedge agreements and other agreements. *Id.*

Thus, there is simply no textual basis for Defendants' contention that § 7.5 of the Indenture is limited to "preservation of a security interest." That claim is directly contradicted by the text of § 7.5 and should be rejected.

## D. Direction from the Noteholders Is Not Needed for the Triaxx CDOs to Maintain this Action

Triaxx respectfully submits that, under New York law as now clarified by *Natixi*s, and the terms of the Indenture and CMA, Triaxx has standing to assert the claims in the TAC. Nonetheless, after the 3/21/17 Order, Triaxx's Collateral Manager took steps to attempt to address the standing question further.

The Collateral Manager determined that an assignment of Triaxx's claims themselves was impracticable under the terms of the Indenture because such an assignment would constitute an impairment of collateral. Calamari Decl. ¶¶ 8-9. Accordingly, and consistent with *Natixis*, the Collateral Manager directed U.S. Bank to assign its *authority to pursue the claims* to the Triaxx CDOs or the Collateral Manager, and appoint the Collateral

Manager as its designee, to pursue this action on its behalf.  TAC ¶ 195.  The Collateral Manager

has this power under the governing agreements, as *Natixis* makes clear, particularly where U.S.

Bank does not (and cannot) deny it has a blatant conflict of interest because U.S. Bank is being

asked to sue itself.  *Cf. Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("no-

action" clause of indenture does not bar action where trustee is the defendant).

    U.S. Bank argues that it is required to act only if Triaxx's controlling noteholders

direct U.S. Bank to assign the claims back to Triaxx (*see, e.g.,* Defs. Br. at 13).[7]  This argument

is without merit for several reasons.

    **First**, § 5.13 of the Indentures exempts the Trustee (*i.e.*, U.S. Bank) from having

to "take any action that it determines might involve it in liability."  Calamari Decl., Exs. 4-6.

Because the entire purpose of this lawsuit is to hold U.S. Bank (and BNYM) liable (in their

capacities as trustees of the underlying RMBS trusts), the CDO noteholders have no ability under

§ 5.13 to require U.S. Bank to do anything in furtherance of this action.

    **Second**, as noted, assigning the claims would constitute a material impairment of

Collateral requiring (i) the unanimous consent of *all* noteholders and Hedge Counterparties, and

(ii) a Supplemental Indenture under § 8.2 of the Indentures.  This is impossible as a practical

matter.  Calamari Decl. ¶¶ 8-9.  U.S. Bank is fully aware of this impracticability, yet insists that

Triaxx attempt it anyway.  This is a breach of duty that the Seventh Claim in the TAC seeks to

remedy, if necessary, through an award of equitable relief.  *See* Point V, *infra*.

    **Third**, assignment of the claims (as opposed to the authority to pursue the claim

on behalf of the Secured Parties) is not necessary.  As shown, the Indenture itself provides clear

---

[7]  The Court raised this possibility in the 3/21/17 Order, at 12-13.

evidence that the Issuer shares enforcement responsibility, as recognized in *Natixis*. Section 7.5(a)(iv) requires the "*Issuer (or the Trustee* on behalf of the Issuer), to . . . take such other action as may be necessary or advisable or desirable to . . . (iv) enforce any of the Pledged Securities or other instruments or property included in the Collateral." Calamari Decl., Exs. 4-6 (emphasis added). The Indenture calls upon the *Issuer* to take action to enforce the Pledged Securities for the benefit of the Noteholders in circumstances, for example, as here, where the Trustee has a blatant conflict of interest and cannot be expected to sue itself.

## II.

## TRIAXX HAS STANDING TO<br>PURSUE ITS TORT CLAIMS

Defendants claim that Triaxx lacks standing to assert the Tort Claims because (i) Triaxx was not injured as result of Defendants' misconduct (*see* Defs. Br. at 7-10); and (ii) Triaxx assigned the Tort Claims to U.S. Bank, as CDO Trustee (*see* Defs. Br. at 10-13). These arguments are contrary to New York law and unsupported by the decisions cited.

### A.   Triaxx Suffered a Cognizable Injury

Defendants first claim that Triaxx lacks standing to assert the Tort Claims because Triaxx does "not hold the RMBS certificates and do[es] not plausibly allege that [Triaxx] personally suffered losses as a result of Defendants' conduct." Defs. Br. at 9.

As an initial matter, this argument suffers from Defendants' continued "misunderstanding of the role[s]" of Triaxx and the Collateral Manager in this CDO transaction. *Natixis*, 149 A.D.3d at 132. Courts do not strictly construe standing and injury-in-fact principles in the RMBS/CDO context. The New York Appellate Division has repeatedly held that RMBS trusts/CDOs and the entities responsible for administering them are not deprived of standing merely because the damages recovered will ultimately flow to underlying noteholders. *Hildene*,

14

963 N.Y.S.2d at 41 (CDO had standing to pursue claims); *Natixis*, 149 A.D.3d at 132 (securities administrator had standing to pursue claims).

In any event, the jumbled mix of cases cited by Defendants wholly fails to support their arguments.  Defendants confound two distinct analyses: (1) Article III standing, and (2) the assessment of the damages element of Triaxx's tort claims.  We address these in turn.

### 1.    Triaxx Has Standing Under Article III

Without even mentioning the concept, Defendants rely on decisions addressing standing under Article III of the U.S. Constitution.

Article III imposes a jurisdictional limitation on diversity actions in the federal courts which requires that a plaintiff has "suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003); *accord Petrohawk Energy Corp. v. Law Debenture Trust Co.*, 2007 U.S. Dist. LEXIS 5803, at *8 (S.D.N.Y. Jan. 29, 2007).

For Article III purposes, an issuer suffers injury – and therefore has standing – when its ability to make payments to underlying noteholders has been impaired.  *See Petrohawk*, 2007 U.S. Dist. LEXIS 5803, at *8 ("The injury-in-fact that [the issuer] identifies is its potential liability to the [n]oteholders for the diverted funds.").

Here, there can be no doubt that Defendants' misconduct has impaired Triaxx's ability to make payments to the noteholders.  *See, e.g.*, TAC ¶¶ 184, 190.  One of Triaxx's obligations under the Indenture is to "duly and punctually pay all principal and interest" to the noteholders.  Indenture § 7.1 (describing the payment duties of the Co-Issuers – one of whom is Triaxx); *see id.* at Granting Clauses (stating Triaxx "remained liable" for its obligations).  Those payments are made from an account to be held in Triaxx's name.  Indenture § 10.3 ("The Trustee

15

shall, prior to the Closing Date, establish a segregated Securities Account which shall be designated as the 'Payment Account,' which shall be held in the name of the Issuer."); *id.* § 11.1 (describing disbursement of cash from the Payment Account).  Thus, when Defendants breached their duties to protect the underlying RMBS trust assets, thereby causing defaults in payments on the RMBS certificates, which should have flowed into the Triaxx CDOs, those breaches impair Triaxx's ability to make payments to the CDO noteholders (through the CDO structure).

   The Article III standing analysis is similar to the injury-in-fact standing analysis under New York law.  *See Petrohawk*, 2007 U.S. Dist. LEXIS 5803, at *6 n.2.  In *Hildene Capital Mgt., LLC v. BNY Mellon*, the New York Appellate Division rejected the argument that a CDO issuer "does not have standing to assert a claim for damage to the trust estate, because any alleged injury was sustained by nonparty noteholders."  963 N.Y.S.2d 38, 40 (N.Y. App. Div. 1st Dep't 2013).  This Court should do the same.

   Defendants rely on the fact that Triaxx "do[es] not hold the RMBS certificates" and that, at the time of Defendants' misconduct, U.S. Bank, "on behalf of the CDO noteholders, was the holder of the RMBS certificates."  Defs. Br. at 8-9.  This argument is immaterial. Possession of the RMBS certificates is not determinative of standing.  "While ownership or possession of property *may* provide evidence of standing, . . . it is *injury* that is at the heart of the standing question."  *U.S. v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added).

   Triaxx was the original holder of the RMBS certificates.  Triaxx assigned those certificates to the Trustee (now U.S. Bank) for the "benefit and security of the Secured Parties," which include the noteholders *and the Collateral Manager*, from whom Triaxx is now taking direction.  Although it is not in physical possession of the RMBS certificates, Triaxx retains an

equitable interest (*see Natixis*, 149 A.D.3d at 132) and has suffered actual injury (as shown

above) sufficient to establish Article III standing to bring the Tort Claims (as well as the Contract

Claims).  Defendants' claim that "if any party was injured" by U.S. Bank's (and BNYM's)

misconduct, it was U.S. Bank "as holder of the RMBS certificates" is clearly wrong and should

be rejected.  Defs. Br. at 9.

      **2.**       <u>**Triaxx Has Adequately Alleged Damages**</u>

      In addition to relying on Article III standing decisions, Defendants cite two

decisions dismissing a plaintiff's claims for failure to allege the damages element of the

plaintiff's tort claims.  Both are entirely distinguishable.

      In *House of Europe v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 49894

(S.D.N.Y. Mar. 31, 2014), Judge Sullivan dismissed the claim of a CDO noteholder who, "in

conclusory fashion," alleged "financial harm" to both the CDO and noteholder, but failed to

allege any "facts showing that [the noteholder] bore any of the loss."  *Id.* at \*30-32.  Judge

Sullivan found that a noteholder "can sustain an injury" where there has been a default in

payment or "the market value of the security has decreased."  *Id.*  He dismissed the tort claims,

however, because the noteholder failed to allege non-payment to the noteholder or that the

certificates it held "ever decreased in market value as a result of the alleged conduct" by

defendants.  *Id.*

      Here, in contrast, the TAC contains the decline-in-market-value allegations that

Judge Sullivan found absent from the noteholder's complaint in *House of Europe*.  In Exhibit A

to the TAC, Triaxx alleges that the RMBS certificates comprising the Triaxx CDOs had both

principal writedowns and/or diminutions in value resulting from Defendants' misconduct.  While

Triaxx must prove these damages at trial, the TAC certainly alleges sufficiently that such damages occurred.  Accordingly, the holding in *House of Europe* has no bearing here.

Similarly, the court's decision in *Dexia SA/NV v. Morgan Stanley,* 41 Misc. 3d 1214(A) (N.Y. Sup. Ct. Oct. 16, 2013) has no applicability to Triaxx's claims.  There, a noteholder purchased RMBS certificates from a prior noteholder and then brought fraud claims against the sponsor and related entities.  *Id.* at 1214(A).  In response, Defendants claimed that the noteholder-plaintiff "suffered no damages" and therefore the fraud claims must be dismissed.  *Id.* In a ruling upheld by the Appellate Division, the trial court found that the noteholder "sustained no losses on the RMBS it purchased" because "it received exactly the purchase price upon the sale to . . . plaintiffs" and there was "no allegation that pass-through payments due to [plaintiff] as holders of the participation certificates were missed."  *Id.*

The *Dexia* decision is distinguishable for two reasons.  **First**, the assignment in *Dexia* was done as part of a sale of the RMBS certificates from one noteholder to another and the prior noteholder gave up all interest in the certificates.  Here, the assignment was made to a Trustee as part of a CDO issuance, and Triaxx (and others) retained a beneficial interest in the RMBS certificates that were assigned, including an obligation to protect the collateral.  **Second**, like in *House of Europe*, the *Dexia* court found that plaintiff suffered no financial losses.Here, in contrast, Triaxx has alleged both principal writedowns and/or market value declines with respect to the particular RMBS certificates which comprise the Triaxx CDOs.[8]

---

[8] The decision in *FDIC v. Citibank N.A.,* 2016 U.S. Dist. LEXIS 186200 (S.D.N.Y. Sept. 30, 2016) is irrelevant. *FDIC* dealt with the plaintiff's standing to assert contract and Streit Act claims, not the tort claims asserted by Triaxx in this Action.  The court's analysis in *FDIC* was based on New York law providing that a ***contract claim*** transfers with a bond when it is sold.  *Id.* at *11-12.  This has no bearing on Triaxx's standing to assert the Tort Claims, which (for the reasons described in Point II(B)) were not assigned.  In addition, like in *Dexia*, FDIC involved an assignment from one noteholder to another, not an assignment to a trustee.

Accordingly, Triaxx has adequately alleged the damages element of the Tort Claims in a manner consistent with New York law governing RMBS trusts and CDOs.

**B.**     **Triaxx Did Not Assign the Tort Claims**

Defendants also claim that Triaxx lacks standing to assert the Tort Claims because Triaxx allegedly "transferred any tort claims relating to the RMBS certificates in the Granting Clauses . . . ." Defs. Br. at 10.  This argument flies in the face of the Court's 3/21/17 Order and controlling New York law.

In the 3/21/17 Order, the Court held that "tort claims do not transfer with a broad assignment of rights; they only transfer with an *express* assignment of those claims." 3/21/17 Order at 13 (emphasis added); *see Commonwealth of Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.,* 25 N.Y.3d 543, 551 (N.Y. 2015) (requiring "some expressed intent or reference to tort causes of action, or some explicit language evidencing the parties' intent to transfer broad and unlimited rights and claims").

Here, the Granting Clauses contain only a broad assignment of all rights, title and interest in the property held by Triaxx.  They contain no express assignment of the Tort Claims or express language evidencing any intent to assign those claims.  Decisions in the RMBS/CDO context make clear that the generalized "right, title and interest" language on which Defendants rely is insufficient to effectuate a transfer of tort claims.  *See Dexia SA/NV v. Morgan Stanley*, 135 A.D.3d 497, 497 (N.Y. App. Div. 1st Dep't 2016) ("agreement to deliver 'all right, title and interest' in the RMBS to . . . plaintiffs did not include fraud claims, since [transferor] only assigned rights in the subject securities without explicitly referencing any related tort claims . . .

.")[9]; *Royal Park Invs. SA/NV v. Morgan Stanley et al.*, 2017 N.Y. Misc. LEXIS 1374, at *10 (N.Y. Sup. Ct. Apr. 12, 2017) (the "language of ['']rights, title, and interest in and to the Portfolio Property['] reveals no verifiable intention to include tort claims").  To the extent the federal cases cited by Defendants hold otherwise, those decisions precede *Commonwealth* and *Dexia*, did not involve RMBS trusts or CDOs, and are therefore inapplicable.[10]

Moreover, even if Defendants were correct that Triaxx assigned the Tort Claims to U.S. Bank, there would still be no basis for dismissing those claims in this context.[11] Defendants' myopic focus on the fact that the Trustee holds *legal* title to the RMBS certificates ignores the fact that other entities have equitable interests sufficient to confer standing to bring claims.  *Natixis*, 149 A.D.3d at 132 (a trust "delegates equitable ownership" to other entities that "administer[] the trust"); *Hildene*, 963 N.Y.S.2d at 41 (rejecting argument that the assignment in a Granting Clause deprived a CDO issuer of standing to assert claims against a trustee).  The assignment of legal title is of no moment in regards to this transaction.

Defendants' contention that the "overall structure of the CDOs" supports their argument is wrong.  Defs. Br. at 12.  The "overall structure of the CDOs" includes Granting Clauses that state explicitly that the assignment to U.S. Bank was made "for the benefit and

---

[9] Defendants claim that *Dexia* is inapplicable because the decision allegedly "rests on an important distinction between claims relating to the acquisition of certificates versus claims arising out of injuries suffered while holding certificates."  Defs. Br. at 11.  Nothing in the *Dexia* decision shows that the court relied on any such distinction.

[10] *See Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*, 509 F. App'x 82 (2d Cir. 2013); *Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229 (S.D.N.Y. 2007); *Pro Bono Inv., Inc. v. Gerry, No.*, 2008 U.S. Dist. LEXIS 87450 (S.D.N.Y. Oct. 29, 2008).

[11] The cases cited by Defendants involved run-of-the-mill purchase and sale transactions having nothing to do with the complex administration of RMBS trusts and CDOs.  *See Algonquin*, 509 F. App'x at 84-85 (involving the sale of a loan to develop hydroelectric power plants); *Int'l Design Concepts*, 486 F. Supp. 2d at 233 (involving the sale of assets of an apparel company); *Pro Bono Inv.*, 2008 U.S. Dist. LEXIS 87450, at *4-18 (involving transfer of investment company assets).

security of the Secured Parties," including the noteholders and Collateral Manager.  Calamari

Decl., Exs. 4-6 (Indenture).  The "overall structure of the CDOs" appoints a Collateral Manager

with an *obligation* to take all actions it "reasonably believes to be in the best interests of the

Noteholders."  *Id.* Exs. 1-3 (CMA, § 2(d)(xi)).  Accordingly, the "overall structure of the CDOs"

demonstrates that it would damage the noteholders not to allow Triaxx, acting under the

direction of the Collateral Manager, to pursue these claims.  This Court should reject U.S.

Bank's attempt to invoke the assignment provisions in the Granting Clauses for its own self-

interested benefit.  *See Hildene*, 963 N.Y.S.2d at 41 (rejecting an interpretation that "would lead

to the perverse result that a grant made expressly to secure compliance with the indenture and to

benefit [the CDO] and the noteholders would preclude [the CDO] from bringing claims, for the

benefit of itself and the noteholders, to recover damages" for the trustee's breaches).

III.

**THE ECONOMIC LOSS DOCTRINE
DOES NOT BAR TRIAXX'S TORT CLAIMS**

Defendants incorrectly seek dismissal of the Tort Claims based on the economic

loss doctrine.  In evaluating the application of the economic loss doctrine, "[t]he dispositive issue

is whether [the trustee] owed duties to the plaintiffs that were separate from the duties set forth in

the [governing agreements]."  *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, 2016 U.S.

Dist. LEXIS 41119, at *44 (S.D.N.Y. Mar. 28, 2016).  As Judge Failla recently observed:

> Courts in this District have split with regard to the application of the
> economic-loss doctrine to tort claims brought against an RMBS
> trustee.  Dispositive in each case has been the nature of the plaintiff's
> claims: Does plaintiff allege damages that flow from the violation
> of a professional duty, or merely from the violation of the governing
> agreements?  Courts have denied motions to dismiss where plaintiffs
> have pleaded tort claims grounded in *extra-contractual duties*.

21

*Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank*, 2017 U.S. Dist. LEXIS 48609, at \*58 (S.D.N.Y. Mar. 30, 2017) (emphasis added).

Here, the TAC alleges damages resulting from Defendants' breach of (i) their extra-contractual duties to avoid conflicts of interest (*see* TAC ¶¶ 166-179); and (ii) their extra-contractual fiduciary duties to act as a prudent person would have acted under the circumstances (*see* TAC ¶¶ 48-50, 180-191). Such damages "flow from the violation of [Defendants'] professional dut[ies]." *Blackrock*, 2017 U.S. Dist. LEXIS 48609, at \*58. Accordingly, the economic loss doctrine does not apply. *See, e.g.*, *id.* at \*\*58-60; *FMS Bonds, Inc. v. Bank of N.Y. Mellon*, 2016 U.S. Dist. LEXIS 98856, at \*48-49 (S.D.N.Y. July 28, 2016) (post-EOD breach properly states a claim for breach of fiduciary duty); *Phoenix Light*, 172 F. Supp. 3d 700, 718-19 (S.D.N.Y. 2016) (refusing to dismiss tort claims on economic loss doctrine grounds); *Royal Park*, 109 F. Supp. 3d at 609-10 (S.D.N.Y. 2015) (negligence but not conflict of interest claims barred by economic loss doctrine).

In addition, the economic loss "doctrine makes exception . . . for actions against professionals . . . for failure to exercise reasonable care, irrespective of their contractual duties." *TekVet Techs., Co. v. CrystalTech Web Hosting, Inc.*, 2016 U.S. Dist. LEXIS 55064, at \*14 (S.D.N.Y. Apr. 25, 2016) (quotations omitted); *see Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 18 (2d Cir. 2000) (the doctrine allows "recovery in the limited class of cases involving liability for the violation of a professional duty"). Accordingly, the economic loss doctrine is not applicable to the Tort Claims against Defendants, which are professional trustees charged with violating their professional duties of care.

## IV.

### TRIAXX HAS STATED CLAIMS FOR BREACH OF
### EXTRA-CONTRACTUAL FIDUCIARY DUTIES

In the First Amended Complaint, Triaxx asserted a breach of fiduciary duty claim against Defendants based on their failure to abide by their contractual duties as set forth in the PSAs.  As the Court recognized in the 3/21/17 Order, Triaxx did not pursue that claim in the proposed Second Amended Complaint.

Following the 3/21/17 Order, Judge Failla clarified the law in this area in *Blackrock*, 2017 U.S. Dist. LEXIS 48609, at *50-52.  The court dismissed the plaintiff's pre-EOD fiduciary duty claims (analogous to those Triaxx asserted in the First Amended Complaint) on the ground that a trustee's pre-EOD contractual duties are not fiduciary duties.  However, the court sustained the plaintiff's claims for post-EOD breach of extra-contractual fiduciary duties. *Id*. at *49-52.  Following the law as clarified in *Blackrock*, Triaxx states claims for post-EOD breach of extra-contractual fiduciary duties.  *See* TAC at ¶¶ 180-191 and n. 12.

## V.

### TRIAXX'S SEVENTH CAUSE OF ACTION
### STATES A VALID CLAIM FOR RELIEF

While Triaxx respectfully submits that *Natixis* and § 7.5 of the Indenture establish Triaxx's standing as Issuer, under New York law, to assert the claims in this action, if doubt remains on that subject the Court should exercise its equitable power to direct U.S. Bank to carry out the request made by Triaxx in its April 18, 2017 letter to U.S. Bank, and assign authority to pursue the claims to Triaxx.  This is the relief sought by Triaxx's Seventh Cause of Action.

It is not disputed by U.S. Bank that U.S. Bank is a trustee with a conflict of interest as the claims in this case are against U.S. Bank.  It is also clear that courts have equitable power to direct a trustee with a conflict of interest to do what is necessary to remedy the conflict.

23

*See, e.g.*, *Amara v. Cigna Corp.*, 925 F. Supp. 2d 242, 260 (D. Conn. 2012) ("Courts of equity exercised a 'general superintending power' over trustees, regulating fiduciary conduct with a broad range of tools."), *aff'd*, 775 F.3d 510 (2d Cir. 2014); *In re Joint E. & S. Dist. Asbestos Litig.*, 1991 U.S. Dist. LEXIS 7527, at *218 (E.D.N.Y. May 16, 1991) ("Matters relating to the control and supervision of trusts are within the equity jurisdiction of the court, and the power of the court of equity is usually invoked to require a trustee to perform a duty under a Trust." (citing *In re A.H. Robins Co.*, 880 F.2d 769, 776 (4th Cir. 1989))); *Benedict v. Amaducci*, 1993 U.S. Dist. LEXIS 3556, at **34-35, 44-45 (S.D.N.Y. 1993) (enjoining trustees with conflict of interest from engaging in transactions); Restatement 3d of Trusts, § 95, Comment c ("[A] court may impose one or more other remedies, as appropriate to the circumstances, for the trustee's misconduct.  These possible additional or alternative remedies include: . . . enjoining the trustee to take or refrain from taking certain action(s) or otherwise to avoid committing a breach of trust . . [or] issuing such other orders or taking such other action as may be appropriate to the circumstances and in the interest of sound administration of the trust.").

　　　　　Here, the Collateral Manager has acted according to the terms of the Indenture and CMA in requesting that U.S. Bank as trustee assign to the Collateral Manager or the Issuer the authority to pursue the claims in this action.  Triaxx has shown both a conflict on the part of the Trustee and an inherently reasonable remedy consistent with the parties' contractual structure.  Should the Court find *Natixis* and § 7.5 of the Indenture insufficient to confer standing

on Triaxx, the Court is authorized to, and should, grant the equitable relief requested by Triaxx's Seventh Cause of Action; thus, a valid claim for relief is stated.[12]

### Conclusion

For the foregoing reasons, Defendants' Joint Motion to Dismiss Triaxx's Third Amended Complaint should be denied in its entirety.

Dated:  August 28, 2017

MILLER & WRUBEL P.C.

Charles R. Jacob III
John G. Moon
Nicholas Cutaia
Kerrin T. Klein
570 Lexington Avenue
New York, New York 10022
(212) 336-3500
Facsimile: (212) 336-3555

cjacob@mw-law.com
jmoon@mw-law.com
ncutaia@mw-law.com
kklein@mw-law.com

*Attorneys for Plaintiffs*

---

[12] Triaxx has not moved for preliminary relief on the Seventh Cause of Action because that will be unnecessary if the Court agrees that *Natixis* and § 7.5 of the Indenture confer standing on Triaxx.  The Seventh Cause of Action reserves Triaxx's rights in that regard.